1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

3

4       JEAN PHLEGER,                                    No.  C 07-01686 SBA

                    Plaintiff,                           **ORDER**
5
                                                         [Docket Nos. 200, 207, 211, 245]
6           v.

7       COUNTRYWIDE HOME LOANS, INC.,
        doing business as AMERICA'S
8       WHOLESALE LENDER, *et al.*,

                    Defendants.
9       _____

10
        And related cross-, counter-, and third-party suits
11
        _____
12

13                              **INTRODUCTION**

14              This matter arises from a dispute over a $3.3 million mortgage and a $550,000 home equity

15      line of credit secured against plaintiff/counter-defendant Jean Phleger's home in San Francisco.

16      Phleger has sued defendants/counter-plaintiffs (1) Countrywide Home Loans, Inc. dba America's

17      Wholesale Lender, (2) Countrywide Bank, N.A., and (3) Reconstruct Company, N.A. (collectively,

18      "Countrywide") for violating the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*,

19      cancellation, and recission.  Countrywide has counter-sued Phleger for, inter alia, judicial

20      foreclosure on the deeds of trust securing the mortgage and the line of credit.  Phleger has sued

21      third-party defendant Stewart Title of California, Inc. ("Stewart") for negligence, breach of fiduciary

22      duty, and indemnity.

23              Before the Court are five motions:  (1) Phleger's Motion for Partial Summary Judgment (the

24      "First Motion") [Docket No. 200]; (2) Phleger's Motion for Summary Judgment on the Issue of

25      Liability on Her Second and Third Causes of Action against Stewart Title of California, Inc. (the

26      "Second Motion") [Docket No. 207]; (3) Stewart's Motion for Summary Judgment, or in the

27      alternative, Partial Summary Judgment (the "Third-Party-Motion") [Docket No. 211]; (4) Stewart's

28      Administrative Motion Pursuant to Civil Local Rule 7-11 for Leave to File [1] Objections to

Evidence Proffered by Plaintiff, and [2] Motion to Strike Such Evidence [Docket No. 245]; and (5) Stewart's Motion to Strike [Docket No. 245, Attach. "1"].

The Court finds these matters appropriate for resolution without a hearing under Federal Rule of Civil Procedure 78(b).  For the reasons discussed below, the Court DENIES the First Motion, GRANTS in part and DENIES in part the Second Motion and the Third-Party Motion, GRANTS Stewart's administrative motion, and DENIES Stewart's Motion to Strike.

**BACKGROUND**

**I.     Factual Developments**

Plaintiff/counter-defendant Jean Phleger is 70 years old and owns 2728 Green Street ("Green Street"), her San Francisco home, and owns property in Woodside California.  In July 2005, these assets were purportedly worth approximately $6.7 million and $30.0 million, respectively.  In early 2005, Phleger met cross-defendant/third-party defendant Michael Edison, owner of Private Wealth Management.  Edison represented that he could increase Phleger's existing Wells Fargo home equity line of credit to assist her with paying bills.  His intent, however, was to siphon off for his own benefit a substantial portion of any funds obtained, without Phleger's knowledge.  On May 6, 2005, Phleger provided Edison with a full power of attorney over all of her legal, financial, and real estate matters.  In this same month, Edison established a joint account in Las Vegas in his and Phleger's name, using his mailing address.

On July 12, 2005, defendant/third-party plaintiff George W. Hannah II ("Hannah"), an employee of defendant/third-party plaintiff First National Mortgage Sources, LLC ("First National"), allegedly interviewed Phleger by telephone to complete a loan application.  The application recites an incorrect birth date for Phleger and an incorrect construction year for Green Street.  It also contains internal inconsistencies, such as reciting that Phleger is retired but also self-employed.  Phleger testified that she never met or spoke with Hannah prior to filing this suit in August 2006.

In August 2005, Phleger's home equity credit line balance was $959,000.  On or about August 30, 2005, Edison obtained a new Wells Fargo home equity credit line for $1.47 million, used it to pay off the prior credit line, and had the $500,384 remainder wired to the Las Vegas joint

1   account.

2       On or about August 3, 2005, Hannah contacted Stewart to open an escrow transaction.  He

3   provided a copy of Edison's power of attorney to Stewart and a copy to Countrywide.

4       On or before September 16, 2005, Countrywide prepared a Deed of Trust for a $3.3 million

5   mortgage, and a Deed of Trust and Assignment of Rents for a $550,000 line of credit ("LOC"), both

6   secured against Green Street.  It also prepared one Notice of Right to Cancel ("NORTC") for the

7   mortgage on or before September 15, 2005, one NORTC for the LOC on or before September 16,

8   2005, and closing instructions on or before September 15, 2005.  It sent these documents to Stewart.[1]

9   On or before September 16, 2005, Stewart prepared escrow instructions.

10       The closing instructions require that all documents be signed before September 17, 2005.

11   They also require that the loan close "on or before the earliest to occur of (1) 09/21/2005 when the

12   dates in the loan documents will no longer be valid, or (2) 09/22/2005, when the interest rate lock

13   expires."

14       Stewart's agent testified that on September 15, 2005, Hannah sent her an e-mail, instructing

15   her to send all the transaction documents to Edison at a certain e-mail address and to a New York or

16   New Jersey address.  Later on September15 or on September 16, Hannah instructed that rather than

17   e-mail the documents, she should overnight them to Edison in Las Vegas for Saturday delivery.  On

18   Friday, September 16, 2005, she sent the documents to Edison via overnight delivery.  She testified

19   that she might have also e-mailed them, but she did not recall.

20       Notary Public Jeanie Hilario testified that on *Sunday*, September 16, 2005,[2] a woman

21   presented to her as Jean Phleger signed the deeds, the NORTCS, and the escrow instructions, and

22   that she notarized the documents this same day.  These documents bear what purports to be

23   Phleger's signature and handwritten dates of September 16, 2005.  Further, the notary documents

24   bear what purports to be Hilario's signature and handwritten dates of September 16, 2005.  Hilaro

25   _____

26   [1]       Prior to preparing the documents, Countrywide reviewed a Landsafe Credit Merge Report
     and an appraisal.  Although Phleger has alleged the report contains data which should have made
27   Countrywide suspicious, she has presented no expert testimony on this issue.

28   [2]       The Court takes judicial notice under Federal Rule of Evidence 201(b) that September 16,
     2005 was a Friday.

1    also testified, however, that she was not licensed in California, and on the forms, all pre-printed

2    designations for a California signing have been stricken to reflect a Clark County, Nevada signing.

3         Phleger has denied signing the documents.  She testified that she was in Los Angeles on

4    Friday, September 16, 2005, and that she was in Woodside, California on September 18, 2005.

5         Both NORTCs specify that the borrower has the right to cancel the transaction within three

6    business days of the latest of the following events:  (1) the transaction date; (2) the receipt of Truth-

7    in-Lending disclosures; or (3) the receipt of the NORTC.  Each NORTC has a handwritten

8    transaction date of "9/16/05[.]"  Each NORTC also specifies that if the borrower cancels by mail,

9    telegram, or other delivery of written notice, he or she must send it by midnight of "9/20/05" or

10   midnight of the third business day following the latest of the three events.  *Id.*

11        Stewart's agent testified she handwrote the "9/20/05" date on the NORTCs, after she

12   received the documents back from Edison, purportedly signed by Phleger and notarized by Hilario

13   on September 16, 2005.  She also testified that she did not suspect any improprieties due to the

14   September 16, 2005 signature dates, as she believed at that time that she might have e-mailed the

15   documents to the e-mail Edison provided.

16        After the closing, Edison used the $3.85 million to retire the $1.47 million Wells Fargo home

17   equity credit line, and had the $2.3 million remainder wired to the Las Vegas joint account.  He then

18   transferred the funds to other accounts and used them for his own benefit.

19   **II.   Procedural Developments**

20        On February 1, 2006, Phleger revoked Edison's power of attorney.  On February 14, 2006,

21   she sued him and Private Wealth Management, in San Francisco Superior Court, and he defaulted.

22   On August 16, 2006, she sued Countrywide, First National, and Hannah.[3]

23        On February 13, 2007, Edison was indicted for wire fraud.  On October 14, 2008, he pled

24   guilty to three counts of wire fraud, 18 U.S.C. § 1343, two counts of mail fraud involving another

25

26

27   ───────────────

28   [3]     First National and Hannah settled with Phleger, with the Court's approval, on November 11,
     2008.  *See* Docket No. 246.

                                                 4

victim, 18 U.S.C. § 1341, conspiracy to obstruct justice,[4] 18 U.S.C. §§ 371, 1519, and obstruction of justice, 18 U.S.C. §§ 2, 1519.  He is currently incarcerated and faces up to 25 years in prison.  He has agreed he owes $2,309,830 to Phleger as restitution.  In his plea, he did not discuss any parties to this matter, other than Phleger.

On March 8, 2007, Phleger filed a second amended complaint (the "SAC").  She sued Countrywide for a TILA violation, negligence,[5] cancellation of contract, and rescission of contract based on mistake, incapacity, and failure of consideration.  The SAC recites that "Jean Phleger hereby intends service of this [SAC] in this action to serve as notice of rescission of the [Mortgage] and [LOC] Loan Agreements, to the extent those agreements relate to or concern Jean Phleger and/or [the Property]."  Docket No. 202, Ex. "F" at 1. ¶ 84.  She also seeks a declaration and injunction against Countrywide, consequential and punitive damages, and attorneys' fees and costs.

On March 23, 2007, Countrywide removed the matter to this Court based on the TILA claim, first raised in the SAC.  *See* Docket No. 1.  On June 18, 2007, Countrywide counterclaimed against Phleger and cross-complained against Edison.  *See* Docket No. 80.  Against Phleger, it asserts claims for judicial foreclosure of the Mortgage and LOC, money owed on notes, breach of contract, unjust enrichment, equitable subrogation, and declaratory relief, and asserts she owes $3.85 million.  *See id.*  Against Edison, it claims equitable indemnity.  *See id.*  On July 26, 2007, Phleger filed a third-party complaint against Stewart, alleging negligence, breach of fiduciary duty, and indemnity.  *See* Docket No. 87.

On November 16, 2007, the Court granted Phleger's application for a temporary restraining order to prevent Countrywide from selling Green Street at public auction.  *See* Docket No. 144.  On December 17, 2007, the Court approved a stipulated preliminary injunction between Phleger and Countrywide against Green Street's non-judicial sale pending disposition of this matter.  *See* Docket No. 185.  On January 4, 2008, the Court denied Stewart's motion to strike (construed by the Court as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)), except to the extent Phleger

---

[4]     Edison had his wife prepare false documents for the United States Attorney indicating Phleger had loaned him $2.25 million.

[5]     The Court dismissed this claim on June 4, 2007.  *See* Docket No. 72.

1   had alleged a TILA violation.  *See* Docket No. 188.  In October and November 2008, the parties

2   filed the motions currently before the Court.

3                                    **LEGAL STANDARD**

4          Summary judgment is appropriate if no genuine issue of material fact exists and the moving

5   party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*,

6   477 U.S. 317, 322-23 (1986).  The party moving for summary judgment must demonstrate that there

7   are no genuine issues of material fact.  *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029,

8   1035 (9th Cir. 2007).  An issue is "genuine" if the evidence is such that a reasonable jury could

9   return a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

10  (1986); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  An issue is "material" if

11  its resolution could affect the outcome of the action.  *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d

12  at 1146.

13         In responding to a properly supported summary judgment motion, the non-movant cannot

14  merely rely on the pleadings, but must present specific and supported material facts, of significant

15  probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith*

16  *Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th

17  Cir. 2002); *Fed. Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001).  In determining whether a

18  genuine issue of material fact exists, the court views the evidence and draws inferences in the light

19  most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of*

20  *the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564,

21  568 (9th Cir. 2004).

22         These same standards apply when parties file cross-motions for summary judgment.  *See*

23  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001); *ACLU of N.M. v.*

24  *Santillanes*, 506 F. Supp. 2d 598, 624 (D.N.M. 2007).

25                                       **ANALYSIS**

26  **I.     Phleger's Motion for Partial Summary Judgment against Countrywide**

27          **A.     Phleger's TILA Claim**

28           Because there is a factual dispute as to whether the transaction closed on September 16 or

18, 2005, Phleger is not entitled to summary adjudication.  In her Motion for Partial Summary Judgment (the "First Motion"), Phleger asserts that the undisputed evidence shows her mortgage and LOC documents were signed on September 18, 2005.  First Mot. at 10.  She thus asserts the NORTCs only provided two business days for rescission, rather than three, as mandated by the TILA, triggering a three-year rescission period under the TILA, ending September 18, 2008.  *Id.* She thus argues that if she had signed the mortgage and LOC documents she could not be held liable to Countrywide, as she rescinded the transaction in her SAC, within this three-year period.  *Id.*

"The TILA was enacted by Congress to " 'avoid the uninformed use of credit.' "  *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir. 1989) (*quoting Mourning v. Family Publ'ns Serv. Inc.*, 411 U.S. 356, 377 (1973) (*quoting* 15 U.S.C. § 1601)).  "In order to effectuate this purpose, the TILA has been liberally construed in this circuit.  *Jackson*, 890 F.3d at 120.  "Even technical or minor violations of the TILA impose liability on the creditor.  *Id.*  Thus, " '[t]o insure that the consumer is protected . . . [the TILA and accompanying regulations must] be *absolutely complied with and strictly enforced*.' "  *Id.* (*quoting Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir. 1983)) (emphasis added).

Applicable here, section 125(a) of the TILA, 15 U.S.C. § 1635(a), provides that in any consumer credit transaction in which a security interest in a consumer's principal dwelling is retained, the consumer:

> shall have the right to rescind the transaction until midnight of the *third business day* following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later . . . .

15 U.S.C. § 1635(a); *Jackson*, 890 F.3d at 120 (emphasis added).

Section 1635(a) also requires that the creditor "clearly and conspicuously disclose, in accordance with regulations of the [Federal Reserve] Board, to any obligor in a transaction subject to this section the rights of the obligor under this section."  15 U.S.C. § 1635(a).  In turn,

7

section 226.23(b)(1)(v) of Regulation Z of the Federal Reserve Board[6] provides that notice of the right to rescind "shall clearly and conspicuously disclose . . . [t]he date the rescission period expires." 12 C.F.R. § 226.23(b)(1)(v); *Jackson*, 890 F.2d at 120. "If the required notice or material disclosures are not delivered, the right to rescind shall expire *3 years after consummation*, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first." 12 C.F.R. § 226.23(a)(3) (emphasis added); *Jackson*, 890 F.2d at 120. Thus, in *Semar v. Platte Valley Federal Savings & Loan Ass'n*, the Ninth Circuit affirmed rescission of a loan 14 months after commencement, where the loan documents stated the loan could be rescinded three days after July 16, 1982, but failed to provide the deadline, leaving the entry blank. 791 F.2d 699, 701-05 (9th Cir. 1986).

The only admissible evidence before the Court tending to show when the deeds, the NORTCs, and escrow instructions were signed are the documents themselves and Phleger's and Hilario's testimony.[7] Phleger testified she was not in San Francisco on September 16 or 18, 2005. Hilaro testified a woman identified as Jean Phlege signed the documents in San Francisco, on *Sunday,* September 16, 2005. The Court notes that *September 16*, 2005 was not a Sunday, but *September 18*, 2005 was. The documents are all dated September 16, 2005, and Stewart entered a cancellation deadline of September 20, 2005 in the NORTCs premised thereon.[8] If the documents were signed on the 18th, rather than the 16th, then the cancellation deadline did not provide three business days to rescind as required by the TILA. As a result, the mortgage and LOC transactions could be rescinded up through September 18, 2008, which Phleger allegedly did, on March 8, 2007. The Court, however, may not resolve this issue as a matter of law, because whether the documents

---

[6] " '[A]bsent some obvious repugnance to the statute, the . . . regulation [of the Federal Reserve Board implementing the TILA] should be accepted by the courts, as should the Board's interpretation of its own regulation.' " *Jackson*, 890 F.3d at 120 n.3 (*quoting Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981)).

[7] In their pleadings, the parties refer to other evidence which is inadmissible, such as unsworn statements, statements witnesses may make in the future, non-existent exhibits, and deposition testimony unsupported by transcripts or supported by uncertified transcripts.

[8] Countrywide asserts that unlike the NORTCs in *Semar*, its had cancellation dates, and thus *Semar* is not controlling here. Docket No. 220 at 18. Countrywide fails to consider, however, that Stewart's agent testified to adding the dates, *after* Phleger purportedly signed *blank* NORTCs.

were signed on the 18th is a genuine issue of material fact in dispute.[9]  *See Anderson*, 477 U.S. at 248.  The Court thus DENIES Phleger's motion to summarily adjudicate her claim for a TILA violation.

### B.        Countrywide's First and Second Claims for Judicial Foreclosure

Section 1635(b) of Title 15 states that "[w]hen an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission."  15 U.S.C. § 1635(b); *Semar*, 791 F.2d at 702 n.7, 705.  Phleger asserts that because she has provided a timely and proper notice of rescission under 15 U.S.C. § 1635(a), Countrywide's security interests became void.  First Mot. at 10-11.  The Court DENIES summary adjudication in favor of Phleger on Countrywide's claims for judicial foreclosure, given the factual dispute underlying Phleger's ability to rescind over a three-year period.

### C.        Phleger's Evidentiary Objections

Phleger filed seven evidentiary objections [Docket No. 236] to statements made in a declaration filed by Countrywide employee Brian McClure [Docket No. 221] and twelve objections to statements made in a declaration filed by Countrywide's counsel, Kenneth R. Styles, Esq. [Docket No. 222].  The Court OVERRULES all of Phleger's objections as she fails to support them with any legal analysis, and as the basis for resolving them is not readily apparent on their face.[10]

## II.      Phleger's and Stewart's Cross-Motions for Summary Judgment

After Countrywide counter-sued Phleger, she sued Stewart for indemnity, negligence, and breach of fiduciary duty.  Phleger then filed a motion for summary adjudication (the "Second Motion") of the issue of liability on her negligence and breach of fiduciary duty claims.  Stewart then filed a motion for summary judgment or alternatively summary adjudication (the "Third-Party

---

[9]      Countrywide asserts that if Phleger signed the documents on September 18, 2008, then she could not prevail under the TILA, because she *must* have backdated them.  Docket No. 220 at 15-17.  Countrywide points to no specific evidence to support the predicate condition, nor considers that the evidence could just as easily support a finding of backdating by persons other than Phleger.

[10]      Moreover, the Court OVERRULES as moot all of her objections to McClure's statements and her fourth, seventh, and eighth objections to Styles' statements, as the Court did not rely on them in disposing of the First Motion.

9

Motion").

**A.      Phleger's Claim for Indemnification**

Stewart seeks summary adjudication of Phleger's indemnification claim.  Stewart is entitled to summary adjudication of three of the eight grounds that Phleger asserts in support of her indemnification claim, but it is not entitled to summary adjudication of her five other grounds. Phleger alleges that if she is found liable to Countrywide, Stewart should indemnify her, because it followed the instructions of someone other than her or Countrywide in distributing the mortgage and LOC funds, and/or because Stewart failed to follow the escrow or closing instructions.[11]  Second Mot. at 1.  Stewart asserts that if a factfinder finds that Phleger is liable to Countrywide for borrowing the mortgage and the LOC funds, then logically, that factfinder would also find that Phleger signed the mortgage and LOC documents.  Third Party Mot. at 1.  Stewart further asserts that on such findings, it could not have done anything wrong, as Phleger by definition would be a party to the escrow, and it followed her attorney-in-fact's instructions.  *Id.*

For support, both parties rely on *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.*, 27 Cal.4th 705, 1160A, 117 Cal.Rptr.2d 541, 41 P.3d 548 (2002).  *Summit* held that:

> An escrow holder is an agent and fiduciary of the parties to the escrow.  The agency
> created by the escrow is limited--limited to the obligation of the escrow holder *to*
> *carry out the instructions of each of the parties to the escrow*.  If the escrow holder
> fails to carry out an instruction it has contracted to perform, the injured party has a
> cause of action for breach of contract.

*Id.*, 27 Cal.4th at 711 (citations omitted) (emphasis added).

> In delimiting the scope of an escrow holder's fiduciary duties, then, we start
> from the principle that an escrow holder must *comply strictly with the instructions of*

---

[11]      Phleger also alleges that Stewart improperly removed Green Street from a trust, Docket No. 87 ¶ 11.b(3), but the evidence suggests that Phleger did this on August 22, 2005, Docket No. 209, Ex. "A" at 118:8-120:20; Docket No. 226, Ex. "A" at 204-205; Docket No. 224, Ex. "J" Phleger also asserts that her indemnification claim will not be "ripe" for adjudication until she is found liable to Countrywide.  "Ripeness" implicates jurisdiction.  *See Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 579-80 (1985).  Phleger provides no legal authority for the proposition that this Court lacks subject matter jurisdiction over her indemnity claim, until liability has been established.

1    *the parties.*  [Nonetheless,] . . . an escrow holder has no general duty to police the

2    affairs of its depositors; rather, an escrow holder's obligations are limited to faithful

3    compliance with the depositors' instructions.  *Absent clear evidence of fraud, an*

4    *escrow holder's obligations are limited to compliance with the parties' instructions.*

5    *Id.* at 711 (citations and quotation marks omitted) (emphasis added).

6         The Court agrees with Stewart that in order for Phleger to be found liable to Countrywide, a

7    factfinder must find that she signed the mortgage and the LOC documents.  If this finding is made,

8    then by definition, she will be a party to the escrow.  Thus, under *Summit*, the question becomes

9    whether Stewart has shown as a matter of law that it did not breach its duties to Phleger or

10   Countrywide, the escrow parties, and that it followed the escrow and closing instructions.

### 1.    Breach of Duty

12        Assuming that Phleger is found to be a party to the escrow, she has shown that there is a

13   genuine issue of material fact as to whether Stewart had "clear evidence of fraud," and failed to stop

14   the escrow, thus breaching its duty to the parties to the escrow.[12]  Phleger notes that it is undisputed

15   that Edison initially instructed Stewart to e-mail the transaction documents, but then instructed

16   Stewart to *instead* overnight them to Las Vegas.  Stewart then *overnighted* the documents *on*

17   *September 16, 2005.*  Phleger asserts that Stewart thus had clear evidence of fraud when it received

18   the signed mortgage and LOC documents from Edison, ostensibly backdated to *September 16, 2005.*

19   Second Mot. at 2-3, 11.  Stewart disagrees, given its agent's testimony that when she received the

20   documents, she *believed that she might* have e-mailed them to Edison, though *she cannot recall*

21   whether she did.[13]  Docket No. 225 at 6.

22        The Court first notes that it is undisputed that when Stewart's agent received the transaction

23   _____

24   [12]    Phleger also alleges that Stewart negligently supervised the agent who processed the
     mortgage and LOC documents.  Second Mot. at 12.  She alleges the agent was inexperienced, poorly

25   trained, and inadequately supervised.  *Id.*  She provides no evidence, however, regarding what level
     of experience, training, or supervision meets the standard of care in the escrow industry.

26
     [13]    Phleger also alleges that Stewart's agent testified that she would have retained such an e-mail

27   if she had e-mailed the documents.  Docket No. 229 at 3.  Phleger alleges that the absence of this e-
     mail thus shows that the agent did not e-mail the documents.  *Id.*  The Court notes that the agent

28   only testified that she *might* have retained such an e-mail, Docket No. 230, Ex. "F" at 66-67, but
     observes that there is no evidence in the record that she did.

documents, she processed the *$3.85 million transaction* based *solely* on her *unsubstantiated belief* that she *might* have e-mailed them, *against* Hannah's express instructions.  Viewing this evidence in a light most favorable to Phleger, *see Anderson*, 477 U.S. at 255, a reasonable jury could find that Stewart's agent failed to dispel the clear evidence of fraud before her, because she relied on her *speculation* of what she *might have done*, rather than *verify* what she *did*.  Moreover, it is undisputed that Stewart produced no evidence during discovery of any e-mail by which its agent sent the documents to Edison.  The only "evidence" proffered is the agent's speculation that she *might or might not have* done so, *but she cannot recall*.  Viewing this evidence in a light most favorable to Phleger, *see id.*, a reasonable jury could find that the agent did *not* e-mail the documents. A reasonable jury could thus find that had the agent e-mailed documents related to the $3.85 million transaction, there would be evidence of it, and more importantly, had she made any attempt to verify whether she had e-mailed the documents, she would have realized that she had not, and stopped the escrow.  Thus, Phleger has demonstrated the existence of a genuine issue of material fact as to whether Stewart had "clear evidence of fraud," *see id.* at 248, and by failing to stop the escrow, breached its duty to the parties to the escrow, *see Summit*, 27 Cal.4th at 11.  The Court thus DENIES Stewart's request for summary adjudication of Phleger's indemnification claim, to the extent it is based on its alleged breach of duty to the parties to the escrow.

## 2.     The Escrow Instructions

Stewart is not entitled to summary adjudication of Phleger's indemnification claim, to the extent it is based on allegations that Stewart breached its duty to follow the escrow instructions. Phleger asserts that Stewart failed to follow two escrow instructions.  The first specifies that "[on] or before September 22, 2005, the undersigned (herein "Borrower(s)"[)] will hand [Stewart] (herein "Escrow Holder"), the funds and/or documents required by Borrower's Lender."  Docket No. 209, Ex. "B" at 1.  The second specifies that all documents or funds due to "Borrower(s)" are to be "wired to Borrower(s), as per separate wire instructions provided by Borrower(s)."  *Id.*  Phleger asserts that Stewart violated the first instruction by closing, even though she never *personally* handed any documents to its agents.  Second Mot. at 8.  And, she asserts that Stewart violated the second instruction by following Edison's and/or Hannah's instructions, and by wiring funds to the

joint account in Las Vegas.  *Id.* at 8-9.  Stewart counters that it had a copy of Edison's power of attorney, and when it received the signed and dated mortgage and LOC documents, it received a deposit slip for the Las Vegas joint account and Edison's instructions to wire funds to it.  Docket No. 225 at 7-8.  Further, its expert witness testified it is common for escrow agents to only have direct contact with a borrower's agents.[14]  Docket No. 227 ¶ 5.

The Court notes that as already discussed there is a genuine issue of material fact as to whether Stewart had "clear evidence of fraud" before it, and should have stopped the escrow, when it received the documents back from Edison, signed and dated on the same day they were overnighted to him.  As such, there is a genuine issue of material fact as to whether Stewart, when it received Edison's wiring instructions along with these documents, reasonably followed the escrow instructions by relying on either his documents or his wiring instructions.  Had Stewart investigated and found that it had not e-mailed the documents, it would not have relied on either.  As *Summit* holds, only "[a]bsent clear evidence of fraud, [are] an escrow holder's obligations . . . limited to compliance with the parties' instructions."  27 Cal.4th at 711.  As Phleger has shown a genuine issue of material fact, *see Anderson*, 477 U.S. at 248, as to whether Stewart reasonably followed the escrow instructions, the Court DENIES Stewart's request for summary adjudication of Phleger's indemnification claim, to the extent it is based on Stewart allegedly breaching its duty to follow them.

### 3.    The Closing Instructions

Stewart is entitled to summary adjudication of three of six closing instructions that Phleger raises in support of her indemnification claim, but it is not entitled to summary adjudication of the other three instructions.  Phleger asserts that Stewart breached its duty to follow the closing instructions, by failing to follow six of them.  Second Mot. at 10.  Stewart notes that the closing

---

[14]    In her reply, Phleger asserts that Stewart's agent testified she never relied on Edison's *role* as an attorney-in-fact.  *See* Second Mot. at 9 n.4, 11 n.5.  The Court notes that the agent testified that because Phleger signed her own documents, the agent did not rely on seeing Edison's *signature* on them.  Docket No. 209, Ex. "A" at 47:16-17; 131:4-132:12.  Phleger also asserts that under section 4121 of the California Probate Code, Stewart may not rely on an un-notarized power of attorney.  Docket No. 229 at 4.  The Court notes that while Stewart may not claim *statutory immunity* under section 4303(a) of the Probate Code, it may still assert that its reliance was *reasonable under the circumstances.  Kaneko v. Yager*, 120 Cal.App.4th 970, 977-81, 16 Cal.Rptr.3d 183 (2004).

instructions were prepared by Countrywide for Stewart to follow.  Docket Nos. 211 at 14, 225 at 12.
Stewart asserts that a *borrower* may not claim a breach of duty arising from a *lender*'s closing
instructions to an *escrow agent*, as they only create a duty running from the *escrow agent* to the
*lender.  See id.*  Phleger replies that she is a *third-party beneficiary* of Countrywide's instructions.
Docket No. 229 at 9-10.

*Summit* provides a six-factor test for determining whether an escrow agent is liable to third-party.  27 Cal.4th at 715.  These are:

> [1] the extent to which the transaction was intended to affect the plaintiff, [2] the
> foreseeability of harm to him [or her], [3] the degree of certainty that the plaintiff
> suffered injury, [4] the closeness of the connection between the defendant's conduct
> and the injury suffered, [5] the moral blame attached to the defendant's conduct, and
> [6] the policy of preventing future harm.

*Id.* (*quoting Biakanja v. Irving*, 49 Cal.2d 647, 650, 320 P.2d 16 (1958)).

In *Summit*, an escrow agent issued funds at closing to a non-party to the escrow, per the
escrow instructions.  *Summit*, 27 Cal.4th at 709.  The non-party then refused to honor an assignment
it had made.  *Id.*  The assignee, also a non-party to the escrow, sued the agent, asserting that it had
breached a duty to the assignee by issuing funds to the assignor, rather than the assignee.  *Id.*  The
California Supreme Court, analyzing the matter under the factors just stated, disagreed, noting the
general rule is that "an escrow holder incurs no liability . . . for a loss caused by following the
escrow instructions."  *Id.* at 709, 715.

### a.      Intent to affect Phleger

Examining the first factor, in *Summit*, the court found that the escrow transaction was neither
intended to benefit nor affect the plaintiff, who was not a party to the escrow.  *Id.* at 715.  Here, the
escrow transaction was intended to benefit and affect the borrower.  If a factfinder finds that Phleger
is the borrower, then the first *Summit* factor favors finding her a third-party beneficiary.

### b.      Foreseeability

Turning to the second factor, in *Summit*, the court found that the plaintiff had suffered an
injury by not receiving funds under the assignment.  *Id.*  Nonetheless, the court held that while the

escrow agent knew of the assignment, it could not have foreseen that the assignor would breach the assignment. *Id.* Here, if Phleger is found liable to Countrywide, then she will be injured. Whether such injury was foreseeable to Stewart, depends on the nature of the instruction allegedly not followed. Phleger asserts that Stewart failed to follow six of them.

### i.     The Assigned Notary

The first instruction states, "PLEASE INSIST THAT YOUR ASSIGNED NOTARY REVIEW THE 'WARNING REGARDING [NORTC]' PAGE (2C3451US)."   Docket No. 209, Ex. "C" ("Closn'g Inst.") at 1.  Stewart did not do this.  Its expert witness testified, however, that unless a lender prohibits an outside signing or mandates that the notary be an escrow company employee, outside signings are commonplace, and were the norm during September 2005.  Docket No. 227 ¶ 10.  Stewart also notes that Phleger never explains how this review at signing would have benefitted her, where she asserts that she did not sign the documents, and her attorney-in-fact chose an outside notary.  Docket No. 234 at 7.

The Court notes that Stewart fails to provide support for its ostensible conclusion that an outside signing insulates it from its obligation to comply with the instructions.  The instructions imposed a duty upon Stewart to insist that the notary assigned to its closing review the warning with Phleger.  Stewart failed to do so.  Assuming that a fact-finder found Phleger were a party to the escrow and had signed the mortgage and LOC documents in notary Hilario's presence, then had Stewart had Hilario review this warning with Phleger, she would have had the opportunity to rescind under the NORTCs.  Stewart should have foreseen that by failing to have Hilario do this, Phleger could be harmed by losing this opportunity to stop the transaction.

### ii.     The Rescission Contact

The second instruction states that "[a]t the end of the 3-day rescission period, [Stewart] must contact each person who signed a NORTC to confirm that no person has rescinded the loan."  Closn'g Inst. at 3 ¶ 14(v).  Stewart did not do this.  Stewart asserts that its failure is of no moment, as Phleger has not declared that she rescinded the transactions during this period or that she would have, had she been contacted.  Docket No. 234 at 7.  Focusing on forseeability, the Court disagrees.  The Court notes that absent clear evidence of fraud, had Stewart followed this instruction, it would

1   have contacted Edison.  As the Court has already noted, however, a factfinder could find that the

2   dates on the documents Edison returned to Stewart were clear evidence of fraud.  If a factfinder so

3   found, he or she could also find that, rather than rely on Edison's instructions, that Stewart should

4   have contacted Phleger directly, as instructed.  A factfinder could also find that Stewart should have

5   reasonably foreseen that its failure to do so, could financially harm Phleger, due to possible

6   inappropriate conduct by Edison.

7   **iii.      The Closing Dates**

8          The closing instructions require that the mortgage close the earlier of September 21, 2005,

9   when the dates in the loan documents are no longer valid, or September 22, 2005, when the interest-

10  rate lock expires.  Closn'g Instr. at 1 ¶ A.  The mortgage was funded on September 23, 2005.

11  Docket No. 209, Ex. "A" at 114:1-19.  Stewart notes that Phleger fails to explain how this delay is

12  causally related to her harm: Edison's illegal activities.  Docket No. 234 at 7.  Phleger provides no

13  reply.  The Court agrees that Phleger presents insufficient information for the Court to find that

14  Stewart should have reasonably foreseen that this delay would result in an injury to Phleger due to

15  Edison's possible illegal activities.

16  **iv.      The Other Sales Clause**

17         The closing instructions require Stewart to contact Countrywide's chief credit officer, prior

18  to closing or funding, if the transaction involves (1) any other sale, transfer, or financing, except a

19  junior loan approved by Countrywide; (2) if the Source of Title shows a property transfer in the six

20  months preceding the closing; or (3) if any transfers have occurred or will occur after the date and

21  time of the Source of Title, other than the contemplated escrow transaction.  Closn'g Inst. at 2 ¶ C.2.

22  Stewart notes that Phleger fails to provide a predicate which triggers this instruction, such that

23  Stewart allegedly failed to follow it.  Docket No. 234 at 7.  The Court agrees and notes that Phleger

24  attempts to rely on the first clause of this instruction, which requires Stewart to contact

25  Countrywide's CCO, but she makes *no mention of*, much less analyzes, *any* of the three predicates

26  which comprise the remainder of the instruction.  Phleger has shown no breach of duty.

27  **v.      Cash Back to Borrower**

28         The closing instructions require that if the transaction provides for "cash back" to the

borrower, then the funds must be delivered to only the borrower.  Closn'g Inst. ¶ 16.  Here, after the

Wells Fargo credit line was paid off, funds were wired to the Las Vegas account.  Stewart asserts

that this instruction is no different than the escrow instruction directing it to follow the borrower's

wiring instructions.  Docket No. 234 at 8.  Stewart asserts it was thus proper to follow Edison's

instructions to deliver funds to the joint account.  Docket No. 234 at 8.  As the Court already noted,

however, in ruling on the escrow instructions, there is a genuine issue of material fact as to whether

it was reasonable for Stewart to wire funds to this account, on Edison's instructions, given the date

on which the transaction documents were purportedly signed.  As such, a factfinder could find that

Stewart should have reasonably foreseen that if it complied with the "cash back" closing instruction,

based on Edison's instructions, it could financially harm Phleger, due to his possibly inappropriate

conduct.

### vi.     Disbursement Date

The closing instructions require disbursement no "earlier than the fourth business day" after

the borrower has signed the NORTC and other transaction documents.  Closn'g Inst. ¶ 14(v).

Phleger lists this instruction as one which Stewart failed to follow, but never actually addresses it.

*See* Docket No. 207 at 10-11; Docket No. 223 at 15.  Nor is it clear from the evidence when any

funds where "disbursed."  Phleger has not demonstrated how Stewart breached its duty to follow this

instruction.

### c.     Moral Blame

In *Summit*, the court held that "[w]ith regard to the moral blame factor, compliance by [the

escrow company] with its fiduciary duty to follow the instructions of the parties to the escrow was

not blameworthy and is, instead, a policy consideration that militates against concluding the

company had a tort duty in this case."  *Summit*, 27 Cal.4th at 716.  The escrow company in *Summit*,

however, did not have clear evidence of fraud before it.  Here, a factfinder could find that Stewart

had clear evidence of fraud before it, in the form of the transaction documents returned by Edison.

Further, unlike the plaintiff in Summit, who was not a party to the transaction, if a factfinder finds

that Phleger is the borrower here, then she will be party to the transaction.  If so, then a factfinder

could find that Stewart's conduct was morally blameworthy, which would support finding a tort

1    duty.

2                    **d.      Closeness of the Connection**

3          In *Summit*, the injury was caused by a non-party to the escrow breaching an assignment to

4    another non-party, which assignment had no connection to the escrow transaction.  *Id.*  Here, if

5    Phleger is injured, it will be because she is forced to repay the funds which Edison siphoned from

6    the escrow transaction, which a factfinder could find was due to Stewart's failure to follow three of

7    the closing instructions.  Thus, unlike *Summit*, there is a close connection between Stewart's conduct

8    and Phleger's injury.

9                    **e.      Future Harm**

10         The *Summit* court did not consider this factor.  If a factfinder finds that Stewart caused

11   Phleger injury by failing to follow the first, second, or fifth closing instructions, then tort liability

12   would be an appropriate means of discouraging Stewart or another escrow agent from proceeding

13   with escrow in the future, in the face of clear evidence of fraud.  *See Biakanja*, 49 Cal.2d at 651.

14                   **f.      Summary**

15         Based on the evidence before the Court, a factfinder could find that Phleger is Countrywide's

16   borrower, and could find that Stewart had clear evidence of fraud before it, and by closing, breached

17   its duty to follow the first, second, and fifth closing instructions.  If a factfinder so found, then all six

18   *Summit* factors would favor finding Phleger to be their third-party beneficiary, and Stewart would be

19   liable to her for breaching its duty to follow them.  Thus, the Court DENIES Stewart's request for

20   summary adjudication of Phleger's indemnity claim, to the extent it is premised on Stewart allegedly

21   breaching its duty to follow these three closing instructions.  The Court, however, GRANTS

22   Stewart's request for summary adjudication of Phleger's indemnity claim, to the extent it is

23   premised on Stewart allegedly breaching its duty to follow the third, fourth, and sixth closing

24   instructions.

25         **B.      Phleger's claims for negligence and breach of fiduciary duty.**

26         Stewart seeks summary adjudication of Phleger's claims for negligence and breach of

27   fiduciary duty, as does Phleger, but only regarding the issue of liability.  The parties premise their

28   requests on the same alleged breaches analyzed by the Court in part II.A *supra*, discussing Phleger's

1   indemnity claim.  That is, Phleger claims that Stewart had clear evidence of fraud, and thus by

2   closing escrow, breached its duty to the parties to the escrow.  Second Mot. at 2-3, 11.  And she

3   claims that Stewart breached its duty to follow the escrow and closing instructions analyzed in

4   part II.A.  Second Mot. at 8-10.  She further claims that these breaches constitute negligence and

5   breaches of fiduciary duty.  *Id.* at 6-12.  In defense, Stewart raises the same defenses considered by

6   the Court in part II.A.  That is, that it cannot be held liable for Phleger's claims because its only duty

7   was to follow the escrow parties' instructions, which it alleges it did.  Third-Party Mot. at 16-17.

8   And, that it did not breach its duty to follow the escrow instructions, nor did it breach its duty to

9   follow the closing instructions as they did not create a duty running to a non-party to the escrow.  *Id.*

10          The Court first turns to Stewart's request for summary adjudication of Phleger's claims for

11   negligence and breach of fiduciary duty.  Given the symmetry in the parties' arguments between

12   these requests and Stewart's request for summary adjudication of Phleger's claim for indemnity, the

13   Court relies on its analysis of the latter to dispose of the former.  As previously noted, Stewart's duty

14   was limited to following the parties' escrow instructions, "[a]bsent clear evidence of fraud[.]"

15   *Summit*, 27 Cal.4th at 711.  As already noted, however, there is a genuine issue of material fact as to

16   whether Stewart had clear evidence of fraud and failed to stop the escrow, thereby breaching its duty

17   to the parties to the escrow.  Further, there is a genuine issue of material fact as to whether Stewart

18   reasonably followed the escrow instructions or the first, second, or fifth closing instructions.  Thus,

19   the Court DENIES Stewart's request for summary adjudication of Phleger's negligence and breach

20   of fiduciary duty claims, to the extent they are premised on Stewart allegedly breaching its duty to

21   the escrow parties, duty to follow the escrow instructions, or duty to follow the first, second, and

22   fifth closing instructions.  The Court, however, GRANTS Stewart's request for summary

23   adjudication of Phleger's negligence and breach of fiduciary duty claims, to the extent they are

24   premised on Stewart allegedly breaching its duty to follow the third, fourth, and sixth closing

25   instructions.

26          With regards to Phleger's request for summary adjudication of her negligence and breach of

27   fiduciary duty claims, the Court GRANTS it to the extent her claims are premised on Stewart

28   allegedly breaching its duty to the parties to the escrow, duty to follow the escrow instructions, and

duty to follow the first, second, and fifth closing instructions.  Except for its failure to follow the first closing instruction, Stewart's alleged breaches turn on whether it had "clear evidence of fraud." Assuming that Phleger is found to be a party to the escrow, Stewart *cannot* show that there is a genuine issue of material fact as to whether it had "clear evidence of fraud," and failed to stop the escrow.  The undisputed evidence shows that when Stewart's agent received the transaction documents, she *processed the $3.85 million transaction based solely on her belief that she might have e-mailed them, against Hannah's express instructions*.  Viewing this evidence in a light most favorable to Stewart, *see Anderson*, 477 U.S. at 255, *no reasonable jury* could find that Stewart's agent dispelled the clear evidence of fraud before her, based in part on the likelihood that *no reasonable jury* could find that she e-mailed the documents.

With regards to Stewart's alleged failure to follow the first closing instruction, it is undisputed that Stewart failed to ensure that the notary assigned to the transaction advised Phleger how and when she could rescind the transaction.  Assuming that Phleger were found to be a party to the escrow and present for the transaction, no reasonable jury could find that Stewart should not have foreseen that its failure could harm Phleger by depriving her of an opportunity to rescind the transaction.

The Court, however, DENIES Phleger's request for summary adjudication of her negligence and breach of fiduciary duty claims, to the extent these claims are premised on Stewart allegedly breaching its duty to follow the third, fourth, and sixth closing instructions, given the Court's ruling in favor of Stewart with regards to these instructions.

C.      **Phleger's and Stewart's Evidentiary Objections**

Phleger filed evidentiary objections [Docket No. 231] to 11 paragraphs in a declaration filed by Stewart's expert witness, Warren D. Vaughn [Docket No. 227].  The Court OVERRULES as moot the objections to the expert's 11th, 12th, 14th, and 16th paragraphs, as the Court did not rely on them to resolve the Second or Third-Party Motions.  The Court OVERRULES as moot the objections to the expert's 4th, 10th, 13th, and 18th paragraphs as contradicting his deposition testimony, as his deposition testimony was not provided to the Court for use in resolving the Second

or Third-Party Motions.[15]  The Court OVERRULES the objections to the expert's 4th and 7th paragraphs as referring to documents which speak for themselves, as Phleger provides no supporting legal analysis and the basis for resolving them is not readily apparent on their face.  And the Court OVERRULES the objections to the expert's 15 and 17th paragraphs as misstating testimony, because they do not.

Stewart filed evidentiary objections [Docket No. 237] to Phleger's use of two pages from a deposition transcript for Countrywide employee Brent Mochel, *see* Docket No. 224, Ex. "E."  The Court OVERRULES these objections as moot, because the Court did not rely on this exhibit in resolving the Second and Third-Party Motions.

**III.     Stewart's Administrative Motion**

After Phleger filed her reply, Stewart filed an Administrative Motion Pursuant to Civil Local Rule 7-11 for Leave to File [1] Objections to Evidence Proffered by Plaintiff, and [2] Motion to Strike Such Evidence [Docket No. 245] and a Motion to Strike [Docket No. 245, Attach. "1"].  Stewart asserts that with her reply, Phleger filed exhibits "E" through "L," and a chart based on Vaughn's deposition, taken after Stewart filed its opposition.  Stewart also takes issue with a statement by Phleger's counsel in a declaration filed with her reply.  Stewart asserts that this evidence is new, and not "reply" evidence, and is disallowed under *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (A "court need not consider arguments raised for the first time in a reply brief.").

The Court GRANTS Stewart's administrative motion, but DENIES its motion to strike.  Two of the exhibits were not "new" to Stewart.  Exhibit "G," Phleger's trustee certificate, was attached by Stewart to its opposition to the Second Motion.  *See* Docket No. 226, Ex. "C."  Likewise, Exhibit "K," a portion of Hannah's deposition transcript, was attached by Phleger to her *opposition* to the Third-Party Motion.  *See* Docket No. 224, Ex. "I."  As for the chart, counsel's statement, and Exhibits "E," "I," "J," and "L," the Court did not rely on them to dispose of the Second and Third-Party Motions.  As for Exhibit "F," a deposition transcript for Stewart's agent, the Court considered

---

[15]     Phleger attached as Exhibit "E" to her counsel's declaration in connection with her reply for her Second Motion, a rough *uncertified* copy of Vaughn's deposition transcript, which is inadmissible.  *See* Federal Rule of Civil Procedure 80; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 776-77 (9th Cir. 2002).

1  portions of it, but Stewart advances *no argument* as to why it is "new" evidence, not responsive to

2  its opposition, and the Court does not find as such.

3  **CONCLUSION**

4  ACCORDINGLY, the Court DENIES plaintiff/counter-defendant Jean Phleger's Motion for

5  Partial Summary Judgment [Docket No. 200]; GRANTS third-party defendant Stewart Title of

6  California, Inc.'s Administrative Motion Pursuant to Civil Local Rule 7-11 for Leave to File

7  [1] Objections to Evidence Proffered by Plaintiff, and [2] Motion to Strike Such Evidence [Docket

8  No. 245]; and DENIES Stewart's Motion to Strike Evidence [Docket No. 211, Attach. "1"].

9  In addition, the Court GRANTS in part and DENIES in part Phleger's Motion for Summary

10  Judgment on the Issue of Liability on Her Second and Third Causes of Action against Stewart Title

11  of California, Inc. [Docket No. 207] as follows.  The Court GRANTS the motion to the extent

12  Phleger's claims for negligence and breach of fiduciary duty are based on Stewart's alleged breach

13  of duty to the parties to the escrow, duty to follow the escrow instructions, and duty to follow the

14  first, second, and fifth closing instructions.  The Court DENIES the motion, however, to the extent

15  these two claims are based on Stewart's alleged breaches of its duty to follow the third, fourth, or

16  sixth closing instructions.

17  Finally, the Court GRANTS in part and DENIES in part Stewart's Motion for Summary

18  Judgment, or in the alternative, Partial Summary Judgment [Docket No. 211] as follows.  The Court

19  DENIES the motion to the extent Phleger's claims for indemnity, negligence, and breach of

20  fiduciary duty are based on Stewart's alleged breach of duty to the parties to the escrow, duty to

21  follow the escrow instructions, or duty to follow the first, second, and fifth closing instructions.  The

22  Court GRANTS the motion, however, to the extent these claims are based on alleged breaches of its

23  duty to follow the third, fourth, or sixth closing instructions.

24

25  IT IS SO ORDERED.

26

27  January 28, 2009                                   *Saundra B Armstrong*

28                                                                    Saundra Brown Armstrong
                                                                       United States District Judge

22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28