1

2

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

3

4

5

6

7

8

9

JEAN PHLEGER,

           Plaintiff,

   v.

COUNTRYWIDE HOME LOANS, INC.,
doing business as AMERICA'S
WHOLESALE LENDER, *et al.*,

           Defendants.

_____

No.  C 07-01686 SBA

**ORDER**

[Docket No. 242]

10

11

12

And related cross-, counter-, and third-party suits

_____

13

**INTRODUCTION**

14

15

16

17

18

19

20

21

22

      This matter arises from a dispute over a $3.3 million mortgage and a $550,000 home equity line of credit secured against plaintiff/counter-defendant Jean Phleger's home in San Francisco. Phleger has sued defendants/counter-plaintiffs (1) Countrywide Home Loans, Inc. dba America's Wholesale Lender, (2) Countrywide Bank, N.A., and (3) Reconstruct Company, N.A. (collectively, "Countrywide"), for, inter alia, violating the Truth in Lending Act (the "TILA"), 15 U.S.C. § 1601, *et seq*., cancellation, and rescission due to mistake, incapacity, and failure of consideration. Countrywide has counter-sued Phleger for, inter alia, judicial foreclosure on the deeds of trust securing the mortgage and the line of credit.  Phleger has also sued third-party defendant Stewart Title of California, Inc. ("Stewart") for negligence, breach of fiduciary duty, and indemnity.

23

24

25

26

27

28

      Before the Court is Countrywide's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment against Plaintiff (the "Motion") [Docket No. 241]; Phleger's Memorandum of Points and Authorities in Opposition to the Motion (the "Opposition") [Docket No. 242]; and Countrywide's Reply Brief in Support of the Motion (the "Reply") [Docket No. 266]. The Court finds this matter appropriate for resolution without a hearing under Federal Rule of Civil Procedure 78(b).  For the reasons discussed below, the Court GRANTS in part and DENIES in part

1    the Motion, as follows.

2        (1)     The Court DENIES partial summary judgment on the issue of whether Phleger made

3    an election of remedies when she previously filed a Motion for Partial Summary Judgment [Docket

4    No. 200] against Countrywide;

5        (2)     The Court GRANTS partial summary judgment on the issue of whether Edison was

6    Phleger's actual agent, but DENIES partial summary judgment on the issues of (a) whether Edison

7    was Phleger's ostensible agent; (b) whether Edison had the actual authority to obtain a mortgage or

8    line of credit from Countrywide; (c) whether Phleger is liable under the doctrine of respondeat

9    superior for Edison's conduct in obtaining this mortgage and line of credit; and (d) whether Edison

10   had the ostensible authority to obtain this mortgage and line of credit;

11       (3)     The Court DENIES partial summary judgment on Phleger's cancellation claim to the

12   extent predicated on her alleged election of remedies by previously filing a Motion for Partial

13   Summary Judgment [Docket No. 200] against Countrywide, but GRANTS partial summary

14   judgment on this claim to the extent predicated on fraud in the inception or execution;

15       (4)     The Court GRANTS partial summary judgment on Phleger's claim of rescission

16   based on unilateral mistake of fact; and GRANTS partial summary judgment on Phleger's claim of

17   rescission based on incapacity;

18       (5)     The Court DENIES partial summary judgment on Phleger's claim of rescission based

19   on a failure of consideration, to the extent predicated on the fact that her initials are missing from

20   two Uniform Residential Loan Applications; but GRANTS partial summary judgment on this claim,

21   to the extent predicated on: (a) her failure to sign Countrywide's mortgage and line of credit

22   documents; (b) the absence of a power of attorney specific to Green Street; (c) Stewart's breaches of

23   its duty to the escrow parties or to follow the escrow or closing instructions; (d) Countrywide's

24   review of a Landsafe Credit Merge Report; (e) Countrywide's signatures missing from exhibits 14

25   through 16 and 23 of Phleger's deposition transcript; and (f) an alleged breach of a contract between

26   Countrywide and defendant/third-party plaintiff First National Mortgage Sources, LLC regarding

27   supervising defendant/third-party plaintiff George W. Hannah II; and

28       (6)     The Court DENIES partial summary judgment on Phleger's claim for violating the

1   TILA; DENIES partial summary judgment on Phleger's claim for declaratory relief; and DENIES

2   partial summary judgment on Phleger's claim for injunctive relief.

**BACKGROUND**

**I.      Factual Developments**

Plaintiff/counter-defendant Jean Phleger is 70 years old and owns 2728 Green Street ("Green Street"), her San Francisco home, as well as property in Woodside California.  In July 2005, these assets were purportedly worth approximately $6.7 million and $30.0 million, respectively.  Despite these assets, in 2005, Phleger had little liquidity.  She was paying her bills and daily expenses by drawing from a $1 million Wells Fargo line of credit, secured against Green Street, which had a balance in excess of $900,000.  She wanted to increase her credit line, to avoid having to dip into a retirement account or other sources.

Sometime between March and May 2005, her daughter, Kelley Phleger, and her son-in-law, Don Johnson, introduced her to cross-defendant/third-party defendant Michael Edison, owner of Private Wealth Management.  Phleger met with Edison on May 6, 2005, at her Woodside property.  He represented to her that he could increase her Wells Fargo credit line up to $3 to $4 million.  Although she felt these limits were "fine," she did not feel such high limits were a "necessity."  Docket No. 243, Ex. "J" at 188.  Edison's intent, however, was to siphon off for his own benefit a substantial portion of any funds obtained, without Phleger's knowledge.  At this meeting, Phleger signed two limited powers of attorney (the "LPOAs"), allowing Edison to handle her banking and lending with Wells Fargo Bank and with Union Bank.[1]

After the May meeting, Edison contacted defendant/third-party plaintiff George W. Hannah II ("Hannah"), an employee of defendant/third-party plaintiff First National Mortgage Sources, LLC ("First National").  At Edison's request, Hannah prepared two Uniform Residential Loan Applications ("URLAs") for Phleger: one for a $4 million mortgage, and one for a $500,000 line of credit.  In order to complete the URLAs, Hannah contacted Edison's agents a number of times, who

---

[1]      Although Phleger testified that she signed the LPOAs at her May 6 meeting, their cover letter references a February 2005 meeting between Phleger and Edison, the LPOAs are dated February 18, 2005, and appear to have been signed and faxed by Phleger to Edison in March 2005.

advised him that they would obtain the information from Phleger, and call him with it.  He completed the URLAs on July 12, 2005.

The URLAs contain a number of errors, including specifying that the applications are for joint borrowers, and listing the wrong construction date for Green Street, the wrong birth date for Phleger, and specifying that she is self-employed and retired.  One URLA specifies that she is a White female, while the other specifies that she is White Hispanic/Latino female.  One URLA specifies that she was interviewed by telephone, while the other fails to specify any interview method.  Both URLA's provide her address at Green Street, but specify a Henderson, Nevada mailing address and telephone number.

On July 19, 2005, a week after the URLAs were completed, Phleger traveled to Nevada to meet with Edison.  There, she also met his employee Micah Heisler.  Phleger and Edison discussed her existing line of credit, her lifestyle, her annual real estate appreciation, *et seq*.  Further, she signed what she variously describes as "a small pile of papers," a "number of documents[,]" or "a lot of papers."  Docket No. 243, Ex. "J" at 159; Docket No. 262, Ex. "A" at 191.  This included an application to increase her existing line of credit, and what she later testified was, what she thought was another LPOA.  She in fact gave Edison an unlimited power of attorney (the "UPOA") over all her affairs.[2]  Phleger also testified that at this meeting she signed an application to establish joint Wells Fargo checking and savings accounts in Las Vegas,[3] which she believed Edison would use to pay her bills during her frequent trips out of town.

Hannah testified that he first met Phleger at this July 19, 2005 meeting.  He did not see her sign the URLAs, however, which bear the purported signature of Jean C. Phleger and a handwritten

---

[2]     Although she testified that she recalled signing this power of attorney at the July 19, 2005 meeting, it is dated May 6, 2005, the date of her Woodside meeting with Edison.  The UPOA is unlimited in scope, and in part, it expressly allows Edison:

> [t]o execute, acknowledge and deliver any and all contracts, debts, leases, assignments of mortgage, extensions of mortgage, satisfactions of mortgage, release of mortgage, subordination agreements and any other instruments or agreement of any kind or nature whatsoever, in connection therewith, and affecting any and all property presently mine or hereafter acquired, located anywhere, which to my said attorney-in-fact may seem necessary or advantageous for my interest.

Docket No. 243, Ex. "B" at 1, para. 6.

[3]     This application, however, is dated May 25, 2005.

date of "7/19/05[.]"  He later received the signed URLAs from Edison.  He never saw Phleger again, until a deposition in this matter.  Phleger testified that she never met nor spoke with Hannah prior to filing this suit in August 2006.

On or about August 3, 2005, Hannah contacted Stewart to open an escrow transaction.  He provided a copy of the UPOA to Stewart and a copy to Countrywide.  On August 3, 2005, Phleger called her UBS stock broker, Jonathan Usich.  His notes from their conversation state:

> Gail Webb [Phleger's secretary] is retiring.  Jean has hire [sic] Michael
> Edison, a wealth manager from Las Vegas to take over Gail's duties.  She claims he
> is a ver [sic] sophisticated individual and she intends to have him manage
> "everything."  I questioned her on his business name, asset [sic] under management,
> fee structure, experience, methodology, services, etc. . . .  She didn't have a clear
> answer on anything.  She kept on repeating he is very sophisticated and will be
> forming trusts, insurance policies, and cure her problems relating to estate tax and
> cash flow.

Docket No. 243, Ex. "C" at 1.

On August 22, 2005, while in New York, she met with Edison at the Pierre Hotel.  Three to five days prior she had a bout of sciatica.  She had seen various doctors, and on August 22 took "maybe" "a very small dose of Valium," and "maybe" 800 mg of Bufferin or other ibuprofen.  Docket No. 243, Exs. J at 261-62, K at 332-33.  Due to back spasms, she could sit, but found it hard to do so.  Nonetheless, she was able to walk to the meeting.  Edison was "a little vague," but told her that the application for a line of credit increase had not gone through, and that she had to sign more papers for an additional line of credit.[4]  Docket No. 243, Ex. "J" at 262.  She was distracted at this meeting due to her "very severe" back injury.  *Id.*

On August 26, 2005, Countrywide generated an Underwriting Decision/Condition Letter, which specifies that Phleger's purported application for a $4 million loan has been suspended, but a counter-offer has been made for $3.3 million.  It also specifies as an "open" condition for "Prior to

---

[4]	The parties have not produced or provided any further information regarding these papers.

1  Doc" that any "Power of Attorney must be specific to the property at closing and must be durable[.]"

2  *See* Docket No. 262, Ex. "I" at 1.  The "Prior to Doc" conditions in the Letter precede the "Prior to

3  Funding" conditions.  *See id.*  The Countrywide Tech Manual used for underwriting also specifies

4  that Countrywide "will accept powers of attorney that are specific to the transaction and legally

5  enforceable in the state in which the property is located."  *See* Docket No. 262, Ex. "K" at 85.

6  Countrywide's agent Brian McClure testified that this is Countrywide's policy.

7  　　　　The Countrywide agent that processed the URLAs, Brent Mochel, testified that from 2003

8  through 2005, his average mortgage loan ranged from $250,000 to $300,000, and that he only

9  handled five to ten loans over a million dollars.  He recalled that at one point, Hannah set up a three-

10  way telephone call with him and Edison, which lasted about ten minutes.  Mochel found this unusual

11  in that Hannah often did such calls with "his processor," but not with a financial person in Edison's

12  position.  Docket No. 262, Ex. "J" at 56.  Mochel told Edison that Countrywide needed certain

13  documents to finalize Phleger's transaction, and Edison said, "I'll get you what documentation

14  I want to get to you," and abruptly hung up the telephone.  *Id.* at 57.  Mochel was a "little shocked,"

15  as Edison sounded "short and curt," and unwilling to help.  *Id.* at 57-58.  At the time, Mochel

16  thought to himself, "well that was different."  *Id.* at 59.

17  　　　　In August 2005, Phleger's home equity credit line balance was $959,000.  On or about

18  August 30, 2005, Edison obtained a new Wells Fargo home equity credit line for $1.47 million, used

19  it to pay off the prior credit line, and unsuccessfully attempted to have the $500,384 remainder wired

20  to the Las Vegas joint account.  On August 31, 2005, Edison sent Phleger a letter to sign, which

21  directed Wells Fargo to take the proceeds from her line of credit and transfer them from her

22  California account to her Las Vegas account, as Edison had directed Wells Fargo to do, under his

23  power of attorney.  The letter also informed Wells Fargo that Edison would manage the Las Vegas

24  account, and that it should direct any questions or concerns to his private telephone line, provided in

25  the letter.  She signed the letter, and faxed it to Edison and one of his associates, the same day she

26  received it.

27  　　　　On September 2, 2005, Edison provided Usich at UBS with a copy of the UPOA, in order to

28  obtain documents related to Phleger's stock accounts.  Usich had never before seen a UPOA for an

able-minded individual.  Concerned, he called Phleger.  On September 5, 2005, she returned his call, and after hearing his concerns, agreed to contact him later and set up a meeting to discuss the situation.  On September 6, 2005, Usich faxed a copy of the UPOA to Phleger for her review.  Phleger has testified that when she spoke with Usich, she did not understand why Edison would need a UPOA to increase her line of credit.  As such, "a red flag went up," and she called her son, though she did not recall what his response was.  Docket No. 243, Ex. "J" at 164.  She took no further action, however, because someone had told her that a power of attorney was unenforceable unless notarized, which the UPOA was not.[5]  She thus did not believe that Edison could use it for anything other than increasing her line of credit.

On or before September 16, 2005, Countrywide prepared a Deed of Trust for a $3.3 million mortgage, and a Deed of Trust and Assignment of Rents for a $550,000 line of credit (the "LOC"), both secured against Green Street.  It also prepared one Notice of Right to Cancel ("NORTC") for the mortgage on or before September 15, 2005, one NORTC for the LOC on or before September 16, 2005, and closing instructions on or before September 15, 2005.  It sent these documents to Stewart.  On or before September 16, 2005, Stewart prepared escrow instructions.

The closing instructions require that all documents be signed before September 17, 2005.  They also require that the loan close "on or before the earliest to occur of (1) 09/21/2005 when the dates in the loan documents will no longer be valid, or (2) 09/22/2005, when the interest rate lock expires."  Docket No. 209, Ex. "C" at 1, ¶ A.

Stewart's agent testified that on September 15, 2005, Hannah sent her an e-mail, instructing her to send all the transaction documents to Edison at a New York or New Jersey address and to an e-mail address.  Later on September 15 or 16, Hannah instructed that rather than e-mail the documents, she should overnight them to Edison in Las Vegas for Saturday delivery.  On Friday, September 16, 2005, she sent the documents to Edison via overnight delivery.  She testified that she might have also e-mailed them, but she does not recall.

---

[5]     The LPOAs are also unnotarized.

7

Notary Public Jeanie Hilario testified that on *Sunday*, September 16, 2005,[6] a woman presented to her as Jean Phleger signed the deeds, the NORTCS, and the escrow instructions, and that she notarized the documents this same day.  These documents bear what purports to be Phleger's signature and a handwritten date of September 16, 2005.  Further, the notary documents bear what purports to be Hilario's signature and a handwritten date of September 16, 2005.  Hilaro also testified, however, that she was not licensed in California, and on the forms, all pre-printed designations for a California signing have been stricken to reflect a Clark County, Nevada signing.[7]

Edison's employee, Heisler, also testified that Phleger was present for this Sunday closing in San Francisco.  He did not see her sign any documents, however.  All he saw from his table was her and Edison sitting at a table on the opposite side of a very large restaurant in the hotel.  After an hour or so, Edison's wife told Heisler that he could leave and should return by 1:00 or 2:00 p.m., to fly back to Nevada.  He found this unusual, as he was there to discuss insurance with Phleger.  Nonetheless, he left.

Phleger has denied signing any loan documents on September 16 or 18, 2005.  She testified that she was in Los Angeles on Friday, September 16, 2005, and flew up to the Bay area on Saturday, September 17, 2005.  On Sunday, September 18, 2005, she stayed in Woodside all day, watching tennis on television, as she "was in a lot of [back] pain[.]"  Docket No. 262, Ex. "R" at 368.  On Monday, September 19, 2005, she flew back to Los Angeles, for the nighttime premiere of a new television series starring Johnson.

Both NORTCs specify that the borrower has the right to cancel the transaction within three business days of the latest of the following:  (1) the transaction date; (2) the receipt of Truth-in-Lending disclosures; or (3) the receipt of the NORTC.  Each NORTC has a handwritten transaction date of "9/16/05[.]"  Docket No. 202, Ex. "E."  Each NORTC specifies that if the borrower cancels

---

[6]   The Court takes judicial notice under Federal Rule of Evidence 201(b) that September 16, 2005 was a Friday.

[7]   Countrywide has produced what is purportedly Hilario's notary book, indicating two documents were signed by a Jean Phleger on September 16, 2008.  Docket No. 243, Ex. "Q."  Notably, the entries in the "Fingerprint and Other Information" column merely indicate "Loan #1" and "Loan #2."  *See id.*

by mail, telegram, or other delivery of written notice, he or she must send it by midnight of "9/20/05" or midnight of the third business day following the latest of the three events. *Id.*

Stewart's agent handwrote the "9/20/05" date on the NORTCs, after she received the transaction documents back from Edison, purportedly signed by Phleger and notarized by Hilario on September 16, 2005. She did not suspect any improprieties attributable to the September 16, 2005 signature dates, as she believed at that time that she might have e-mailed the documents to the e-mail Edison provided. She sent the documents to Countrywide.

Countrywide's funding agent, Brent McClure, testified that in 2005, when he received loan documents back from a closing for review prior to funding, they included URLAs. He also testified that Countrywide's standard practice was to return an improperly executed URLA to the title company for proper execution. He also testified that he would have done this had Phleger's URLA been missing a signature, date, or her initials on any page. After Countrywide reviewed the signed transaction documents received from Stewart, it released the mortgage and LOC funds to Stewart.

After the closing, Edison used the $3.85 million to retire the $1.47 million Wells Fargo home equity credit line, and had the $2.3 million remainder wired to the Las Vegas joint account. He then transferred the funds to other accounts and used them for his own benefit.

## II.     Procedural Developments

On February 1, 2006, Phleger revoked Edison's power of attorney. On February 14, 2006, she sued him and Private Wealth Management, in San Francisco Superior Court, and he defaulted. On August 16, 2006, she sued Countrywide, First National, and Hannah.[8]

On February 13, 2007, Edison was indicted for wire fraud. On October 14, 2008, he pled guilty to three counts of wire fraud, 18 U.S.C. § 1343, two counts of mail fraud involving another victim, 18 U.S.C. § 1341, conspiracy to obstruct justice,[9] 18 U.S.C. §§ 371, 1519, and obstruction of justice, 18 U.S.C. §§ 2, 1519. He is now serving a 63-month sentence. He has agreed he owes

---

[8]     First National and Hannah settled with Phleger, with the Court's approval, on November 11, 2008. *See* Docket No. 246.

[9]     Edison had his wife prepare false documents for the United States Attorney indicating Phleger had loaned him $2.25 million.

$2,309,830 to Phleger as restitution.  In his plea, he did not discuss any parties to this matter, other than Phleger.

On March 8, 2007, Phleger filed a second amended complaint (the "SAC").  She sued Countrywide for (1) a TILA violation, (2) negligence,[10] (3) cancellation of contract, (4) rescission of contract based on mistake, incapacity, and failure of consideration, (5) conspiracy to defraud, (6) breach of fiduciary duty, (7) elder abuse, and (8) unjust enrichment.  The SAC recites that "Jean Phleger hereby intends service of this [SAC] in this action to serve as notice of rescission of the [mortgage] and [LOC] Loan Agreements[.]"  Docket No. 202, Ex. "F" at 1. ¶ 84.  She also seeks a declaration and injunction against Countrywide, consequential and punitive damages, and attorneys' fees and costs.

On March 23, 2007, Countrywide removed the matter to this Court based on the TILA claim, first raised in the SAC.  *See* Docket No. 1.  On June 18, 2007, Countrywide counterclaimed against Phleger and cross-complained against Edison.  *See* Docket No. 80.  Against Phleger, it asserts claims for judicial foreclosure of the mortgage and the LOC, money owed on notes, breach of contract, unjust enrichment, equitable subrogation, and declaratory relief, and asserts that she owes $3.85 million.  *See id.*  Against Edison, it claims equitable indemnity.  *See id.*  On July 26, 2007, Phleger filed a third-party complaint against Stewart, alleging negligence, breach of fiduciary duty, and indemnity.  *See* Docket No. 87.

On November 16, 2007, the Court granted Phleger's application for a temporary restraining order to prevent Countrywide from selling Green Street at public auction.  *See* Docket No. 144.  On December 17, 2007, the Court approved a stipulated preliminary injunction between Phleger and Countrywide enjoining Green Street's non-judicial sale pending disposition of this matter.  *See* Docket No. 185.  On January 4, 2008, the Court denied Stewart's motion to strike (construed by the Court as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)), except to the extent Phleger had alleged a TILA violation.  *See* Docket No. 188.

On October 6, 2008, Phleger filed a Motion for Partial Summary Judgment [Docket

---

[10]     The Court dismissed this claim on June 4, 2007.  *See* Docket No. 72.

No. 200], seeking partial summary judgment on her claim against Countrywide for violating the TILA.  She asserts that the undisputed facts show that the transaction documents were signed on September 18, 2005.  *See* Docket No. 268 at 7.  She thus asserts that Countrywide violated the TILA, as the NORTCs, which only provided until September 20, 2005 for rescission, did not provide three business days to rescind as required by the TILA.  *See id.*  The Court denied this motion, because there is a genuine issue of material fact as to whether the transaction documents were signed on September 16 or 18, 2005.  *See* Docket No. 268 at 6-7.

On October 14, 2008, Phleger filed a motion for partial summary judgment on her negligence and breach of fiduciary claims against Stewart [Docket No. 207].  And, on October 14, 2008, Stewart filed a motion for summary judgment, or alternatively, partial summary judgment [Docket No. 211].  The Court granted and denied both of these motions in part.  *See* Docket No. 268 at 2.  The disposition of these cross-motions was detailed, and will not be repeated here.  The Court notes, however, that the undisputed evidence presented with the cross-motions showed that Stewart sent the transaction documents to Edison by *overnight delivery*, on *September 16, 2005*, then received them back from Edison on Monday, September 19, 2005, with signatures dated *September 16, 2005*.  *See id.* at 11-12.  The Court found that by proceeding with the escrow despite this clear evidence of fraud, Stewart breached its duty to Phleger, should a factfinder determine her to be Countrywide's borrower.  *See id.*  As a result, the Court granted partial summary judgment for Phleger on the issue of Stewart's liability on her negligence and breach of fiduciary claims, to the extent premised on Stewart's breach of duty to the escrow parties, breach of duty to follow the escrow instructions, and breach of duty to follow certain closing instructions.  *See id.* at 18-20.[11]

On November 7, 2008, Countrywide filed the Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment against Plaintiff (the "Motion") before the Court.

## LEGAL STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

---

[11]     Although Phleger and Countrywide have provided additional evidence with the pleadings before the Court, which evidence was not before the Court when it disposed of Phleger's two prior motions and Stewart's motion, nothing has been provided which would cause the Court to alter its disposition of these three prior motions.

11

party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The party moving for summary judgment must demonstrate that there are no genuine issues of material fact.  *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  An issue is "material" if its resolution could affect the outcome of the action.  *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

In responding to a properly supported summary judgment motion, the non-movant cannot merely rely on the pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp*., 278 F.3d 895, 898 (9th Cir. 2002); *Fed. Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001).  In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).

### ANALYSIS

### I.    Election of Remedies

Countrywide requests partial summary judgment on the issue of whether Phleger made an election of remedies by filing her Motion for Partial Summary Judgment against Countrywide on her TILA claim.  Mot. at 11.  Countrywide alleges that her motion was based on the undisputed fact that *she* signed the transaction documents on September 18, 2005.  *Id.* at 11-12.  Relying on *Suffield Bank v. LaRoche*, 752 F.Supp. 54, 63 (D.R.I. 1990), and *Le Barron v. Le Barron Peters*, 290 A.D.2d 710, 736 N.Y.S.2d 726, 726 (2002), Countrywide concludes that by filing, Phleger elected this theory for the remainder of this litigation, and cannot now deny it.  Mot. at 12.

Phleger counters that in her Motion for Partial Summary Judgment she alleges that the undisputed facts show that *someone else* had signed the documents on September 18, 2005.  Opp'n

12

at 11.  She also claims that she alleges that were she found liable for this person's actions, then Countrywide would be barred from proceeding against her, due to its TILA violation.  *Id.*  She also challenges Countrywide's reliance on *Le Barron*, by asserting that California's doctrine of election of remedies applies to this matter, not New York's.  *Id.* at 11-12.  She asserts that under California law, she has not elected a remedy, because only if her actions have substantially prejudiced Countrywide would she have to make an election *prior to judgment*.  *Id.* at 11-12

Countrywide replies that Phleger cannot raise a TILA violation, unless she signed the transaction documents, relying on *Jensen v. Ray Kim Ford, Inc.*, 920 F.2d 3, 3-4 (7th Cir. 1990).  Reply at 7-8.  Countrywide claims that *Jensen* holds that a "forgery" claim bars a TILA claim.  *Id.*  Countrywide then argues that under either *Latman v. Burdette*, 366 F.3d 774, 781 (9th Cir. 2004), or California law, Phleger has elected a remedy.  *Id.* at 8.

"The doctrine of election of remedies prevents a party from obtaining double redress for a single wrong."  *Latman*, 366 F.3d at 781.  "The doctrine 'refers to situations where an individual pursues remedies that are legally or factually inconsistent.' "  *Id.* at 781-82 (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49 (1974)).

> As a general rule, three elements must be present for a party to be bound to an election of remedies: (1) two or more remedies must have existed at the time of the election, (2) these remedies must be repugnant and inconsistent with each other, and (3) the party to be bound must have affirmatively chosen, or elected, between the available remedies.

*Latman*, 366 F.3d at 782.  The doctrine is no longer strictly enforced in the federal courts.  *Lund v. Albrecht*, 936 F.2d 459, 464 (9th Cir. 1991) (citing *Taylor v. Burlington N. RR. Co.*, 787 F.2d 1309, 1317 (9th Cir. 1986)).  And since the adoption of the Federal Rules of Civil Procedure, it "applies only after a judgment on one of the causes of action is entered."  *Haphey v. Linn County*, 924 F.2d 1512, 1519 (9th Cir. 1991) (quoting *Taylor*, 787 F.2d at 1317).

The Court first notes that the California doctrine of election of remedies applies to the extent California law supplies the rule of decision.  *See In re Prestige Ltd. Partnership-Concord*, 234 F.3d

13

1108, 1114 (9th Cir. 2000); *In re Reaves*, 285 F.3d 1152, 1156-58 (9th Cir. 2002); *Bankers Trust Co. v. Pac. Employers Ins. Co.*, 282 F.2d 106, 110 (9th Cir. 1960). Here, Countrywide argues that Phleger elected her remedy by filing a Motion for Partial Summary Judgment alleging a TILA violation. The TILA is a *federal law*. Thus, the federal doctrine of election of remedies governs this matter, not California's doctrine.

The Court also notes that Phleger correctly states the position she took in her Motion for Partial Summary Judgment: she never alleges that the undisputed facts show that *she* signed any transaction documents on September 18, 2005. Thus, Countrywide's argument fails for lack of a factually true predicate. Even if Countrywide had stated a factually true predicate, however, it has misconstrued and misapplied the doctrine of election of remedies. First, the doctrine of election of remedies "applies *only after a judgment on one of the causes of action is entered.*" *Haphey*, 924 F.2d at 1519 (quoting *Taylor*, 787 F.2d at 1317) (emphasis added). Thus, because *Phleger did not obtain a partial summary judgment* on her TILA claim, she did not elect remedies.

As for Countrywide's reliance on *LaRoche*, 752 F.Supp. at 63, the *LaRoche* court *granted partial summary judgment* for the plaintiff, who was thus held to have elected remedies. As for *Le Barron*, it turns on New York law, which is inapplicable here.[12] *See Le Barron*, 736 N.Y.S.2d at 726. Finally, Countrywide's reliance on *Jensen* is misplaced. *Jensen* holds that because a forged contract is null and void and does not bind its parties, it cannot give rise to a TILA claim, though it might give rise to common law tort claims. *See Jensen*, 920 F.2d at 3-4. The Court notes that if a factfinder determines that Edison forged Phleger's signature on the transaction documents, and that Phleger is not the borrower responsible to Countrywide for the mortgage and the LOC, then she will be unable to pursue a TILA claim against Countrywide. Countrywide has not identified any forged contracts, however, which are null and void as to Phleger, so as to bring this matter under *Jensen*.

---

[12]     Further, while New York law holds that a party elects remedies by filing for summary judgment, *Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & MacRae*, 243 A.D.2d 168, 674 N.Y.S.2d 280, 286 (1998) ("[S]ummary judgment being the procedural equivalent of a trial, a litigant must elect among inconsistent positions upon seeking expedited disposition."), the doctrine appears strongest in cases, unlike this one, involving claims for breach of contract and quasi-contract, also known as unjust enrichment, *see Unisys Corp. v Hercules Inc.*, 224 A.D.2d 365, 367, 638 N.Y.S.2d 461, 462-63 (1996), *appeal withdrawn by* 658 N.Y.S.2d 246, 680 N.E.2d 620 (1997); *H.B.L.R., Inc. v. Command Broad. Assocs., Inc.*, 156 A.D.2d 151, 548 N.Y.S.2d 198 (1989).

1   The Court thus DENIES Countrywide's Motion for Partial Summary Judgment on the issue of

2   whether Phleger made an election of remedies when she filed her Motion for Partial Summary

3   Judgment against Countrywide.[13]

4   **II.     Edison's Agency**

5           In California, "[a]n agent is one who represents another, called the principal, in dealings with

6   third persons.  Such representation is called agency."  Cal. Civ. Code § 2295.  "An agency is either

7   actual or ostensible."  *Id.* § 2298.  An agent's *authority* may also be actual or ostensible.  *See id.*

8   §§ 2315-17.  Countrywide requests partial summary judgment as to whether Edison was Phleger's

9   actual and/or ostensible agent, with actual and/or ostensible authority to engage in the mortgage and

10  LOC transactions with Countrywide, and thus bind Phleger by his actions.  Mot. at 12.

11          In support, Countrywide notes that the following facts are undisputed.  On May 6, 2005,

12  Phleger discussed with Edison increasing her home equity line of credit up to possibly $4 million.

13  *Id.* at 13.  On or before this date she signed LPOAs allowing Edison to handle her banking and

14  lending with Wells Fargo and Union Bank.  *Id.*  On July 19, 2005, she and Edison established a joint

15  checking account.  *Id.*  On or before this date, she signed the UPOA, though she claims she thought

16  it was an LPOA.  *Id.*  By the end of the summer, all her bills and statements were going to Edison.

17  *Id.* at 14.  On August 3, 2005, she told her stockbroker that Edison was very sophisticated and would

18  manage "everything" and "form[] trusts, insurance policies, and cure her problems relating to estate

19  tax and cash flow."  *See id.* at 13.  Between September 2 and 5, 2005, she and her stockbroker

20  discussed his concerns with her UPOA, which he faxed to her.  *Id.*  Phleger then realized that Edison

21  was using the UPOA to contact parties other than Wells Fargo or Union Bank.  *Id.*  Even though "a

22  red flag went up," Phleger did not disavow it, nor contact Edison, as she purportedly thought it

23  legally void.  *See id.*

24  _____

25  [13]     In its Reply, Countrywide asserts that by filing her motion, Phleger is bound by res judicata
    or collateral estoppel.  *Id.* at 9.  Not only do these arguments appear more tenuous than
26  Countrywide's election of remedies argument, the Ninth Circuit holds that "[t]he doctrines of
    election of remedies and res judicata are distinct."  *Haphey*, 924 F.2d at 1519 (noting several
27  differences exist in their theoretical bases).  As such, Countrywide may not substitute one for the
    other.  Because Phleger did not raise these doctrines in her opposition, Countrywide has raised a *new*
28  argument in its Reply.  The Court declines to consider arguments which Countrywide should have
    raised in its Motion.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (2007).

In opposition, Phleger counters that Edison was not her actual or ostensible agent nor had actual or ostensible authority to deal with Countrywide, because Countrywide never accepted the UPOA as evidence of an agency relationship.  Opp'n at 14.  Phleger notes that Countrywide's policy is to "accept powers of attorney that are *specific to the transaction* . . . ."  *See* Docket No. 262, Ex. "K" at 85 (emphasis added); Opp'n at 5.  She points out that Countrywide's agent confirmed this policy in his deposition.  Moreover, she observes that on August 26, 2005, there was an "open" condition in her Underwriting Decision/Condition Letter, which stated that any "Power of Attorney *must be specific to the property* at closing[.]"  *See* Docket No. 262, Ex. "I" at 1; Opp'n at 5.  She observes, however, that the UPOA was not specific to Green Street.  Opp'n at 5.  The Court addresses the parties' arguments by separately considering whether Edison had actual and/or ostensible agency and actual and/or ostensible authority.

## A.     Actual Agency

"An agency is actual when the agent is really employed by the principal."  Civ. Code § 2299. Countrywide asserts that it is undisputed that Phleger employed Edison as her agent to handle *all* her legal and financial affairs.  Mot. at 14.  Phleger counters that Edison was not her actual agent because Countrywide never accepted the UPOA as evidence of an agency relationship.  Opp'n at 14. The Court notes that actual agency turns on whether Phleger employed Edison, *see* Civ. Code § 2299, not whether Countrywide *reasonably believed* that she had employed Edison.  The Court finds that by signing the LPOA, Phleger employed Edison to handle her lending and banking.  She continued his employment by signing the UPOA, even if she believed at the time that it was another LPOA.  As such, Edison was her actual agent from at least May 6, 2005 until she revoked the UPOA on February 1, 2006.  The Court thus GRANTS Countrywide's Motion for Partial Summary Judgment on the issue of whether Edison was Phleger's actual agent.

## B.     Ostensible Agency

"An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is *not* really employed by him."  *Id.* § 2230 (emphasis added).  The parties dispute whether Edison was Phleger's ostensible agent, but do so as part of their dispute as to whether he was her actual agent, without distinguishing the two

16

concepts.  *See* Mot. at 14; Opp'n at 14.  The Court notes that because Phleger "really employed" Edison as her *actual* agent, Edison was not Phleger's ostensible agent.  The Court thus DENIES Countrywide's Motion for Partial Summary Judgment on the issue of whether Edison was Phleger's ostensible agent.

### C.    Actual Authority

"Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." *Id.* § 2316. Countrywide asserts it is undisputed that Phleger *intentionally* gave Edison an UPOA, and thus the actual authority to handle all her legal and financial matters, which included obtaining up to $4 million secured by Green Street, from third parties such as Countrywide.  Mot. at 14-16. Alternatively, Countrywide asserts that because Phleger failed to disavow the UPOA, after her stockbroker faxed it to her in early September 2005, then by *"want of ordinary care,"* she allowed Edison to believe that he had the authority to obtain up to $4 million secured by Green Street, by dealing with third parties such as Countrywide.  *Id.*  Her want of ordinary care is allegedly confirmed by the fact that she did not disavow the UPOA, because she believed it was null and void as unnotarized.  *See id.*  This, however, would have also meant that her unnotarized LPOAs were null and void, depriving Edison of any attorney-in-fact powers, yet she took no action to address this alleged problem.  *See id.*

Relying on *Mannion v. Campbell Soup Co.*, 243 Cal.App.2d 317, 320, 52 Cal.Rptr. 246 (1966), Phleger asserts that she never intentionally conferred on Edison the authority to steal from her, nor could he have reasonably developed such a belief due to any alleged negligence on her part. Opp'n at 14-15.  Countrywide replies that *Mannion* merely states the statutory principles underlying agency law in California, and does not address, much less support, the manner in which Phleger applies them to the facts of this matter.  Reply at 11.

The Court first notes that Countrywide correctly interprets *Mannion*, and that it does not help Phleger.  The Court also agrees with Countrywide's authority analysis.  The Court notes that on or before May 6, 2005, Phleger *intentionally* gave Edison the actual authority to obtain a $4 million credit line secured against Green Street from Wells Fargo or Union Bank.  On or before July 19,

2005, Phleger signed the UPOA, though she later testified she thought at the time it was an LPOA. Assuming this is true, Phleger did not disavow the UPOA, on September 6, 2005, when she received a copy of it from her stockbroker. At this point, *for want of ordinary care*, she allowed Edison to believe that he had the actual authority to obtain $4 million secured against Green Street from *third parties other than Wells Fargo or Union Bank.*[14]

That said, however, the Court notes that despite the UPOA, Edison apparently could not obtain the mortgage or the LOC from Countrywide without Phleger's *express approval*, in the form of her signatures on the transaction documents. She denies signing these documents, however. Construing the evidence in Phleger's favor, *see Anderson*, 477 U.S. at 255, a reasonable factfinder could find that Edison forged Phleger's signature on the transaction documents. If so, he would have *exceeded* the scope of his actual authority. Thus, there is a genuine issue of material fact as to whether he had the actual authority to obtain the mortgage and the LOC from Countrywide. The Court thus DENIES Countrywide's Motion for Partial Summary Judgment on the issue of whether Edison had the actual authority to obtain the mortgage or the LOC from Countrywide.

### D.    Respondeat Superior

Countrywide anticipates in its Opposition that Phleger will argue that she is not responsible for Edison's acts, because he stole from her. Mot. at 14. Countrywide, however, asserts that under § 2338 and § 2339 of the California Civil Code she is nonetheless liable for his conduct under the doctrine of respondeat superior. Mot. at 14-15. Section 2338 states in part that "a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business[.]" In turn, § 2339 addresses an agent's wrongs committed *not* in the transaction of the business of the agency. *De Mirjian v. Ideal Heating Corp.*, 112 Cal.App.2d 251, 253, 246 P.2d 51 (1952). It states that "[a] principal is responsible for no other wrongs committed by his agent than those mentioned in [§ 2338], unless he has authorized or ratified them, even though they are

---

[14]    Phleger testified that she contacted her son about the UPOA, though she did not recall his response. It is undisputed, however, that her son contacted Phleger's stockbroker in October 2005, regarding Edison's plans for his mother's finances. Thus, there is no evidence of her disavowing the UPOA until she revoked it on February 1, 2006.

1   committed while the agent is engaged in his service."

2   Countrywide asserts that Edison committed the tort of fraud.  Mot. at 14.  It notes that

3   *Grigsby v. Hagler*, 25 Cal.App.2d 714, 716, 78 P.2d 444 (1938), holds that under § 2338, "[i]t is

4   well settled in this state that a principal is liable to third parties not only for the negligence of his

5   agent in the transaction of the business of the agency but also for *the frauds* or other wrongful acts

6   committed by such agent in and as a part of the transaction of such business."  Mot. at 14 (emphasis

7   added).  Phleger counters that she is not liable under respondeat superior for Edison's alleged fraud,

8   because Countrywide never relied on Edison's UPOA, because by its own guidelines, the transaction

9   required a power of attorney specific to Green Street, which did not exist.  Opp'n at 5, 14.

10   The Court first notes that assuming for the sake of argument that Edison exceeded the scope

11   of his actual authority by forging Phleger's name on the transaction documents, then if he did so in a

12   "transaction of the business of the agency," then Phleger would be liable for his conduct under the

13   doctrine of respondeat superior.  "Where an actual agent acts outside his or her authority but within

14   the scope of employment, the principal is liable to the injured third party."  3 B. E. Witkin, *Summary*

15   *of Cal. Law*, Agency & Employment, § 175 (10th ed. 2005).

16   The question then is whether Edison acted within the scope of his employment.  *Grigsby v.*

17   *Hagler* provides the answer.  In *Grigsby*, a beverage delivery person, whose duties included

18   collecting charges from the customers on his route, overcharged them without his employer's

19   knowledge, and pocketed the difference.  *Grigsby*, 25 Cal.App.2d at 714-15.  The employer was

20   forced to reimburse the customers, under § 2338.  *Id.* at 715-16.  The court reasoned that the

21   employer directed Grigsby to collect the charges, authorized him to do so, and enabled him to do so

22   by providing him with a truck and a "sales pad."  *Id.* at 716.  The employer thus directly enabled the

23   employee's fraud, which only varied from his regular course of business by an adjustment of the

24   delivery charges.  *Id.*  The court concluded that "[a]lthough he exceeded his authority he was not

25   acting without the scope of his employment," subjecting his employer to liability under § 2338.  *Id.*

26   Phleger does not address whether she stands in the same shoes as Grigsby's employer.  The

27   Court notes, however, that she does, to a point.  She employed Edison to obtain up to $4 million

28   secured by Green Street from third parties such as Countrywide.  Thus, this was the "business of the

19

1  agency."  *See* Civ. Code § 2338.  In turn, the mortgage and LOC transactions with Countrywide

2  were "transaction[s] of the business of the agency."  *See id.*  Therefore, if Edison forged Phleger's

3  name on the transaction documents, he did so "in and as a part of the transaction of such business."

4  *See id*.  Thus, as in *Grigsby*, Phleger directed, authorized, and enabled Edison to commit his fraud,

5  directly related to his employment, which only varied from his regular course of business in that he

6  added her name to the transaction documents.  The Court concludes that Edison's hypothetical

7  forgery would have exceeded the scope of his *actual authority*, but would not have exceeded the

8  scope of his *employment*.[15]

9       Unlike Grigsby's employer, however, Phleger is not subject to liability under § 2338.  The

10  elements of fraud are: "(1) misrepresentation of a material fact (consisting of false representation,

11  concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to deceive and induce

12  reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage."  *City of*

13  *Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.App.4th 445, 481-82, 80

14  Cal.Rptr.2d 329 (1998); *see* Civ. Code §§ 1572, 1709-1710.  "It is essential . . . that the person

15  complaining of fraud *actually have relied on the alleged fraud*, and suffered damages as a result."

16  *Merrill Lynch*, 80 Cal.Rptr.2d at 482 (emphasis added).

17       Countrywide alleges that Edison committed a fraud upon it, for which Phleger is liable under

18  the doctrine of respondeat superior.  A condition, however, for the approval of the mortgage and

19  LOC transactions was that Edison "must" provide Countrywide with a power of attorney specific to

20  Green Street, which he never did.  This absence is all the more remarkable, given that

21  Countrywide's agents should have been more circumspect than usual, as they testified that they

22  handled very few transactions over $1 million, much less for $3.85 million.  This absence is even

23  more remarkable, given that Countrywide's processing agent was a "little shocked" early on in the

24  processing, when in an "unusual" occurrence, a conference call between the agent, Hannah, and

25  Edison, Edison was rude and uncooperative regarding getting documentation together.  *See* Docket

26  No. 262, Ex. "J" at 56-59.     Construing this evidence in Phleger's favor, *See Anderson*, 477 U.S. at

27  ─────────────

28  [15]     Section 2339, addressing an agent's acts which exceed the scope of their employment, is thus
inapplicable to this matter.

20

255, a reasonable factfinder could find that Countrywide was on notice regarding irregularities in Edison's conduct, and that it could not have justifiably relied on any alleged misrepresentations he made, when it never even recognized him as Phleger's agent for purposes of borrowing money against Green Street.  Because there is a genuine issue of material fact as to whether Edison committed fraud, there is a genuine issue of material fact as to whether Phleger could be responsible for such fraud under the doctrine of respondeat superior.  The Court thus DENIES Countrywide's Motion for Partial Summary Judgment on the issue of whether Phleger is liable under the doctrine of respondeat superior for Edison's conduct in obtaining the mortgage or the LOC from Countrywide.

### E.      Ostensible Authority

"Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." *Id.* § 2317.  "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof."  Civ. Code § 2334.  The "essential elements" of ostensible authority "are representation by the principal, justifiable reliance thereon by a third person, and change of position or injury resulting from such reliance."  *Yanchor v. Kagan*, 22 Cal.App.3d 544, 549, 99 Cal.Rptr. 367 (1971).

#### 1.      Representation by the Principal

Relying on *Gaine v. Austin*, 58 Cal.App.2d 250, 136 P.2d 584 (1943), and *Reusche v. California Pacific Title Ins. Co.*, 231 Cal.App.2d 731, 42 Cal.Rptr. 262 (1965), Countrywide argues that based on Phleger's statements to her stockbroker that Edison was handling "everything," and her knowledge that he was providing the UPOA to third parties other than Wells Fargo or Union Bank, e.g., her stockbroker, Edison had ostensible authority to transact business with Countrywide. Mot. at 14-16.  Phleger counters that regardless of what she allegedly told her stockbroker, Countrywide fails to show any communications from her or her stockbroker to Countrywide which would allow Countrywide to believe that Edison was her agent.  Opp'n at 15.

The Court notes that there is no evidence of any direct communications between Phleger or Countrywide, nor is there any evidence that she affirmatively directed anyone to deal with Countrywide.  In this regard, *Gaine* does not help Countrywide.  In *Gaine*, a principal told his agent

21

to sell a property, and he told a person living on the property that his agent was going to sell it. *Gaine*, 58 Cal.App.2d at 252-58.  The person directed buyers to the agent, who sold them the property.  *Id.* The court held that the principle had given ostensible authority to his actual agent with regards to the buyers.  *Id.* at 259-60.  *Gaine* is inapposite to this matter.

In contrast, *Reusche* is more on point.  In *Reusche*, an agent forged a principle's signature on loan documents without the principal's knowledge.  *Reusche*, 231 Cal.App.2d at 734.  Despite numerous contacts regarding the loan from third parties, before and after closing, the principal never disavowed the forgery, directed inquiries to her agent, and later made several payments.  *Id.* at 734-35.  The court held that the principal thus gave ostensible authority to her actual agent with regards to these third parties.  *Id.* at 737-78.  Unlike Reusche, Phleger never ratified Edison's conduct involving Countrywide.  Nonetheless, when she failed to disavow the UPOA on September 6, 2005, and knew that Edison was using it with third parties other than Wells Fargo and Union Bank, she could reasonably foresee that he would use it with third parties like Countrywide to accomplish the ends of the UPOA.  She should have known that, by her want of ordinary care, she would cause third persons who received a copy of the UPOA to believe that Edison possessed the authority it provided.  Thus, as of September 6, 2005, she gave him ostensible authority with regards to any person who had or later received a copy of the UPOA.

### 2.      Justifiable Reliance thereon by a Third Person

"A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only *who have in good faith, and without want of ordinary care*, incurred a liability or parted with value, upon the faith thereof."  Civ. Code § 2334 (emphasis added).  The Court already found that there is a genuine issue of material fact as to whether Countrywide justifiably relied on Edison's status or conduct.  *See* part II.D *supra* (discussing the doctrine of respondeat superior).  For the same reasons that the Court reached this conclusion, it also finds that there is a genuine issue of material fact as to whether Countrywide in good faith relied on Edison's status or conduct.  *See id.*

### 3.      Change of Position or Injury Resulting from Such Reliance

Because a genuine issue of material fact exists as to whether Countrywide reasonably or in good faith relied on Edison's conduct as Phleger's purported agent, there is a genuine issue of

1   material fact as to whether it changed its position or was injured due to such reliance.

2   ### 4.   Summary

3   Phleger has shown that a genuine issue of material fact exists as to whether Edison had

4   ostensible authority to borrow money from Countrywide on Phleger's behalf.  The Court thus

5   DENIES Countrywide's Motion for Partial Summary Judgment on the issue of whether Edison had

6   the ostensible authority to obtain the mortgage or the LOC from Countrywide.

7   ## III.   Cancellation

8   "A written instrument, in respect to which there is a reasonable apprehension that if left

9   outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon

10  his [or her] application, be so adjudged, and ordered to be delivered up or canceled."  Cal. Civ.

11  Code. § 3412.  "To 'cancel' a contract means to abrogate so much of it as remains unperformed.  It

12  differs from 'rescission,' which means to restore the parties to their former position.  The one refers

13  to the state of things at the time of the cancellation; the other to the state of things existing when the

14  contract was made."  *Young v. Flickinger*, 75 Cal.App. 171, 174, 242 P. 516 (1925).  The Court's

15  cancellation powers arise in equity, and are much broader than those which apply to rescission.

16  *Boyd v. Lancaster*, 56 Cal.App.2d 103, 110, 132 P.2d 214 (1942).

17  In her SAC, Phleger pleads cancellation on two grounds.  First, she alleges that she did not

18  sign any loan documents on September 16, 2005.  SAC ¶ 50.  Countrywide counters that Phleger

19  cannot prevail on this basis, because she elected remedies when she filed her Motion for Partial

20  Summary Judgment on the basis that she *signed* the transaction documents on September 18, 2005.

21  Mot. at 16.  The Court already found, however, that Phleger did not elect remedies by filing her

22  motion.  The Court thus DENIES Countrywide's Motion for Partial Summary Judgment on

23  Phleger's cancellation claim to the extent predicated on her alleged election of remedies by filing her

24  Motion for Partial Summary Judgment against Countrywide.

25  Turning to Phleger's second ground for cancellation, she pleads that she was the victim of

26  fraud in the inception or execution of the transaction documents, due to directions and

27  misrepresentations provided by Edison while she was impaired due to medication.  *Id.* ¶ 51.

28  Countrywide asserts that Phleger has produced no evidence to support this allegation.  *Id.* at 16-18.

"California law distinguishes between fraud in the 'execution' or 'inception' of a contract and fraud in the 'inducement' of a contract." *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal.4th 394, 415, 926 P.2d 1061 (1996).

> In brief, in the former case " 'the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is void.  In such a case it may be disregarded without the necessity of rescission.' "

*Id.* (quoting *Ford v. Shearson Lehman Amer. Express, Inc.*, 180 Cal.App.3d 1011, 1028, 225 Cal.Rptr. 895 (1986)); *Duffens v. Valenti*, 161 Cal.App.4th 434, 449, 74 Cal.Rptr.3d 311 (2008). Fraud in the inducement, by contrast, occurs when " 'the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable.  In order to escape from its obligations the aggrieved party must rescind. . . .' " *Rosenthal*, 14 Cal.4th at 415 (quoting *Ford*, 180 Cal.App.3d at 1028); *Duffens*, 161 Cal.App.4th at 449.

Phleger contends that she was not in San Francisco on September 18, 2005, but in Woodside, and thus did not sign any transaction documents on this day.  Opp'n at 18.  She also claims that she does not remember signing any transaction documents.  *Id.*  And she claims that on September 18, 2005 she "was in a lot of [back] pain[,]" Docket No. 262, Ex. "R" at 368, which prevented her from traveling.[16]  *Id.*  As such, she argues that she did not have a reasonable opportunity to review any documents prior to signing them.  *Id.*  She concludes that under *Jones v. Adams Financial Services*, 71 Cal.App.4th 831, 84 Cal.Rptr.2d 151 (1999), there is a genuine issue of material fact as to whether she was Edison's victim of fraud in the execution or inception.  Opp'n at 18-19.

The Court notes that Phleger has not produced any evidence that she took any medication on or about September 16 through 18, 2005.  The Court also notes that she has not produced any evidence that on these days she was deceived by Edison as to the nature of her act, and actually did

---

[16]     The Court notes, however, it is undisputed that she flew up from Los Angeles the previous day, and flew back down the next day.

not know what she was signing, or did not intend to enter into a contract at all, when she in fact signed the transaction documents.  *See Rosenthal*, 14 Cal.4th at 415.  Rather, Phleger has only produced evidence that she *did not sign* any transaction documents on September 16 or 18, 2005.  That she does not recall signing these documents is consistent with not having done so.  If Phleger meant by her lack of recollection that she suffered on these days from a mental and/or emotional impairment, then she should have produced supporting evidence to this effect.  While it is disputed as to whether she signed the transaction documents on either September 16 or 18, 2005, there is no dispute regarding Edison's alleged misrepresentations to her on these days, as there is no evidence to show that any occurred.

As for her *Jones* argument, it is without merit.  *Jones* held that a defense to fraud in the inception or execution is that a signer had a reasonable chance, prior to signing, to review the contract.  71 Cal.App.4th at 836-37.  Nonetheless, *Jones* also held that this defense is unavailable where a signer is unable to take advantage of a pre-signature review, due to severe impairments, such as blindness, Alzheimer's, *et seq*.  *Id*.  Phleger seeks to invert *Jones*, and make the absence of a reasonable opportunity for review an element of fraud in the inception or execution.  It is not.  Further, the lack of a reasonable opportunity due to *physical absence*, rather than *impairment*, is not a scenario encompassed by *Jones*.  Phleger has thus failed to show that *Jones* applies to her matter.  The Court GRANTS Countrywide's Motion for Partial Summary Judgment on Phleger's cancellation claim to the extent predicated on fraud in the inception or execution.

**IV.     Rescission**

Phleger pleads three bases for rescinding the transaction documents:  unilateral mistake, incapacity, and failure of consideration.  SAC ¶¶ 57-78.

**A.     Unilateral Mistake of Fact**

By statute, a party to a contract may seek to rescind it due to *bilateral* mistake, that is, due to a mistake on the part of "the party as to whom he [or she] rescinds" or "any other party to the contract jointly interested with such party."  *Id*. § 1688(b)(1).  California, however, also recognizes rescission based on *unilateral* mistake.  *Donovan v. RRL Corp.*, 26 Cal.4th 261, 280-82, 109 Cal.Rptr.2d 807 (2001).  A "[m]istake may be either of fact or law."  Civ. Code § 1576.  Phleger

pleads a unilateral mistake of fact.  SAC ¶ 59.  The elements of a cause of action for unilateral

mistake of fact are: (1) a party made a mistake regarding a basic assumption upon which that party

made the contract; (2) the mistake has a material effect upon the agreed exchange of performances

that is adverse to that party; (3) that party does not bear the risk of the mistake; and (4) the effect of

the mistake is such that enforcement of the contract would be unconscionable.  *Donovan v. RRL*

*Corp.*, 26 Cal.4th 261, 282, 109 Cal.Rptr.2d 807 (2001).

Phleger pleads two grounds for rescinding based on a unilateral mistake of fact.  She first

alleges that she did not sign any loan documents on September 16, 2005.  SAC ¶ 58.  Countrywide

counters that Phleger cannot prevail on this basis, because she elected remedies when she filed her

Motion for Partial Summary Judgment on the basis that she *signed* the transaction documents on

September 18, 2005.  Mot. at 16, 18.  The Court has already found, however, that Phleger did not

elect remedies by filing her motion.  Nonetheless, if a factfinder determines that she did not sign any

loan documents on September 16 or 18, 2005, then she will be unable to rescind based on a

unilateral mistake of fact.  This is because *not signing a contract* does not fit under *Donovan*'s four-

element test, of which the first element is "a mistake regarding a basic assumption upon which that

party *made the contract*."  The Court thus GRANTS Countrywide's Motion for Partial Summary

Judgment on Phleger's claim of rescission based on unilateral mistake of fact, to the extent

predicated on her not signing the transaction documents.

Phleger also pleads that she signed the transaction documents, because she had mistaken

beliefs based on misrepresentations that Edison provided to her regarding the basic nature of the

documents.  SAC ¶¶ 59-60.  Specifically, she claims that she had no knowledge that he had applied

for and had obtained multiple loans from Countrywide, including a home mortgage loan.  *Id.* ¶ 60.

Countrywide asserts that Phleger has produced no evidence to show that Edison made any

misrepresentations.  Mot. at 18.  Phleger argues that she believed that she would receive a line of

credit from Wells Fargo, not a mortgage from Countrywide, and in an amount less than

$3.85 million.  Opp'n at 19.  She thus argues that she qualifies for rescission under *Donovan*.  *Id.*

The Court notes that Phleger has failed to produce any evidence which shows that Edison

made any misrepresentations to her regarding the transaction documents which caused her to sign

them on September 16 or 18, 2005.  That is, she has provided no evidence as to what he said and when he said it, which led her to sign the transaction documents due to her mistaken beliefs regarding lenders, financial vehicles, or amounts borrowed.  Instead, she has only produced evidence that she was *not present* for the signing of the transaction documents on either September 16 or 18, 2005.  Although this fact is in dispute, the absence of any evidence showing Edison's alleged misrepresentations is not.  The Court thus GRANTS Countrywide's motion for Partial Summary Judgment on Phleger's claim of rescission based on unilateral mistake of fact, to the extent predicated on Edison's alleged misrepresentations.

**B.      Incapacity**

California recognizes three degrees of capacity under § 38, § 39, and § 1689(b)(1) of the Civil Code.  Under § 38, "[a] person *entirely without understanding* has no power to make a contract of any kind, but the person is liable for the reasonable value of things furnished to the person necessary for the support of the person or the person's family."  Civ. Code § 38 (emphasis added).  "A conveyance or other contract of a person of *unsound mind, but not entirely without understanding*, made before the incapacity of the person has been judicially determined, is subject to rescission, [under Civ. Code § 1688 *et seq.*]."  *Id.* § 39(a) (emphasis added).  Under § 39:

> "A rebuttable presumption affecting the burden of proof that a person is of unsound
> mind shall exist for purposes of [§ 39] if the person is substantially unable to manage
> his or her own financial resources or resist fraud or undue influence.  Substantial
> inability may not be proved solely by isolated incidents of negligence or
> improvidence.

*Id.* § 39(b).

Finally, a party to a contract may rescind "[i]f the consent of the party rescinding . . . was . . . obtained through . . . *undue influence*, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party."  *Id.* § 1689(b)(1) (emphasis added).

Phleger pleads rescission due to incapacity on two grounds.  First, she asserts that she did not sign any loan documents on September 16, 2005.  SAC ¶ 66.  Countrywide counters that Phleger

1    cannot prevail on this basis, because she elected remedies when she filed her Motion for Partial

2    Summary Judgment on the basis that she *signed* the transaction documents on September 18, 2005.

3    Mot. at 16, 18.  The Court already found, however, that Phleger did not elect remedies by filing her

4    motion.  Nonetheless, if a factfinder determines that she did not sign any loan documents on

5    September 16 or 18, 2005, then she will not be able to rescind based on incapacity.  This is because

6    *not signing a contract* does not constitute evidence of *not having capacity to sign a contract*.  The

7    Court thus GRANTS Countrywide's Motion for Partial Summary Judgment on Phleger's claim of

8    rescission based on incapacity, to the extent predicated on her not signing the transaction documents.

9         Phleger's second ground for rescission due to incapacity is that her signature was obtained

10   when she lacked the capacity to consent.  SAC ¶ 67.  Specifically, she alleges that it was obtained at

11   a time when she "was suffering from a serious and painful injury, the treatment for which included

12   prescription medication which deprived her of the capacity to consent."  *Id.* ¶ 68.  "Moreover, it

13   resulted from the direction and guidance of Edison and was based on fraud and misrepresentations."

14   *Id.*

15        Countrywide asserts that Phleger has produced no evidence to support these claims.  Mot.

16   at 18-20.  Countrywide also notes that Phleger testified that "I remember everything," Docket

17   No. 243, Ex. "M" at 774, and that she would remember if she had signed any Countrywide loan

18   documents in 2005.  Mot. at 19.  Moreover, Countrywide notes that her son testified that his mother

19   was generally sound and competent.  Mot. at 19.  Phleger responds that "[d]uring the relevant time

20   period surrounding the alleged signing of documents at issue in this action, [she] suffered

21   debilitating pain resulting from a back injury . . . [for which] her physicians had prescribed

22   prescription drugs[.]"  Opp'n at 20.  Further, she alleges that she does not remember signing "any

23   Countrywide loan documents."  *Id.*

24        Phleger does not seek a finding of incapacity under § 38.  She only seeks one under either

25   § 39 or § 1689(b)(1).  Turning first to § 39, Phleger asserts that she qualifies as incapacitated under

26   *In re Rains*, 428 F.3d 893 (9th Cir. 2005) and *Guidici v. Guidici*, 2 Cal.2d 497, 41 P.2d 932 (1935).

27   Opp'n at 20.  Per *Rains*, the test for capacity under § 39(a) is whether when a party enters into a

28   contract, they are mentally competent to deal with the subject before them with a full understanding

of their rights.  *Rains*, 428 F.3d at 901 (citing *Smalley v. Baker*, 262 Cal.App.2d 824, 832, 69 Cal.Rptr. 521 (1968), *overruled on other grounds by Weiner v. Fleischman*, 54 Cal.3d 476, 286 Cal.Rptr. 40, 816 P.2d 892 (1991)).  The test is whether they understand the nature, purpose, and effect of what they are doing.  *Rains*, 428 F.3d at 901 (citing *Smalley*, 262 Cal.App.2d at 832).

The Court finds that Phleger has produced no evidence to show that she falls under § 39, *Rains*, or *Guidici*.  First, she denies signing any documents on September 16 or 18, 2005.  Thus, there is no basis on which to consider whether she "understood the nature, purpose, and effect of what" she was signing.  *See Rains*, 428 F.3d at 901.  Assuming, however, that a factfinder determines that she did sign the transaction documents on September 16 or 18, 2005, the only evidence she has produced allegedly regarding her capacity is that *a month earlier*, in New York, on or about August 18 or 19, 2005, she suffered a bout of sciatica and saw "various" doctors.  On August 22, 2005, she took "maybe" "a very small dose of Valium" and 800 mg of Bufferin or other ibuprofen.  Docket No. 243, Exs. J at 261-62, K at 332-33.  Although back spasms made it difficult to sit, she could, and she was able to walk to a meeting with Edison that day, though she found the pain distracting.

Jumping forward *almost a month*, Phleger has produced evidence which shows that on Friday, September 16, 2005, she was in Los Angeles.  On Saturday, September 17, 2005, she flew up to the Bay area.  On Sunday, September 18, 2005, she stayed in Woodside all day, watching tennis on television, as she "was in a lot of [back] pain[.]"  Docket No. 262, Ex. "R" at 368.  And on Monday, September 19, 2005, she flew back down to Los Angeles, for the nighttime premiere of a new television series starring Johnson.

The Court first notes that Phleger has not shown that she took *any* medications from September 16 through 19, 2005.  *Guidici* is thus unavailing to her.  Guidici presented multiple witnesses who testified that for 10 to 14 days prior to signing a deed, he was in an extreme state of intoxication, could barely speak, and at times appeared to be in a stupor.  *Guidici*, 2 Cal.2d at 500-503.  The court also heard expert testimony regarding his capacity.  *Id.* at 501.  Phleger has not even come close to producing evidence of this sort.

The Court also notes that Phleger has failed to show that her back pain prevented her from

traveling back and forth between the Bay area and Los Angeles.  In addition, while she testified that she does not remember signing any documents, she did so to support her allegation that *she did not sign any documents*, not in connection with any medical or psychological evidence which would support incapacity.  Thus, she may not use these statements to dispute her own testimony that she remembers everything and that she would remember signing the transaction documents.  Nor has she contradicted her son's assessment that she is sound and competent.  Construing the evidence in Phleger's favor, *see Anderson*, 477 U.S. at 255, if a factfinder determines that Phleger signed the transaction documents on September 16 or 18, 2005, then they will *not* be able to find under *Rains* that Phleger did not understand "the nature, purpose, and effect of what [she] did" when she signed them.  Thus, Phleger could not be found incapacitated at signing under § 39.

Phleger, however, also alleges that she was unduly influenced by Edison to sign the transaction documents, and thus should be allowed to rescind under § 1689(b)(1).  Opp'n at 21.  The elements of undue influence are: (1) "In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him;" (2) "In taking an unfair advantage of another's weakness of mind;" or, (3) "In taking a grossly oppressive and unfair advantage of another's necessities or distress."  *Id.* § 1575.  Phleger, however, provides no analysis as to how she meets any of these tests.  Moreover, she has not presented *any* evidence as to how her signature might have ended up on the transaction documents due to "the direction and guidance of Edison and . . . based on [his] fraud and misrepresentations."[17]  *See* SAC ¶ 68.  As such, no reasonable factfinder could find that she was the victim of undue influence.  The Court thus GRANTS Countrywide's Motion for Partial Summary Judgment on Phleger's claim of rescission based on incapacity, to the extent predicated on incapacity.

**C.     Failure of Consideration**

A party to a contract may rescind if: (1) "the consideration for the obligation of the

---

[17]     She also fails to address how she could rescind under § 1689(b)(1) for undue influence not by Countrywide, "the party as to whom [s]he rescinds," as provided by § 1689(b)(1), but for undue influence by Edison, her own agent, a situation not expressly governed by § 1689(b)(1).

30

rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds[,]" Civ. Code § 1689(b)(2); (2) "the consideration for the obligation of the rescinding party becomes entirely void from any cause, *id.* § 1689(b)(3); or (3) "the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause[,]" *id.* § 1689(b)(4).

> Failure of consideration is the failure to execute a promise, the performance of which has been exchanged for performance by the other party.  The failure may arise from the wilful breach of the promise. . . .  In all executory contracts the several obligations of the parties constitute to each, reciprocally, the consideration of the contract; and a failure to perform constitutes a failure of consideration, either partial or total, as the case may be, within the meaning of [Civ. Code § 1689].

*Taliaferro v. Davis*, 216 Cal.App.2d 398, 410-11, 31 Cal.Rptr. 164 (1963) (citations, quotation marks, and footnote omitted).

> Failure of consideration does not, however, vitiate the contract from the beginning; until rescinded or terminated a contract once in effect remains in effect.  This last principle rests upon the distinction that failure of consideration is based, not upon facts existing at the time the mutual promises bargained for in a bilateral contract are made, but upon some fact or contingency which occurs between the time of the making of the contract and the action which results in the material failure of performance by one party.

*Id.* at 411.

Phleger pleads rescission due to failure of consideration on two grounds.  First, she asserts that she did not sign any loan documents on September 16, 2005.  SAC ¶ 74.  Countrywide counters that Phleger cannot prevail on this basis, because she elected remedies when she filed her Motion for Partial Summary Judgment on the basis that she *signed* the transaction documents on September 18, 2005.  Mot. at 16, 20.  The Court already found, however, that Phleger did not elect remedies by filing her motion.  Nonetheless, if a factfinder determines that she did not sign any loan documents on September 16 or 18, 2005, then Countrywide will have provided no "consideration" to Phleger

for her "obligation."  *See* Civ. Code § 1689(b)(2)-(4).  Not being obligated to repay Countrywide,

Phleger will have no grounds on which to rescind, nor need to do so, due to the failure of

Countrywide's consideration.  The Court thus GRANTS Countrywide's Motion for Partial Summary

Judgment on Phleger's claim of rescission based on the failure of consideration, to the extent

predicated on her not signing the transaction documents.

Phleger's second ground for rescission due to failure of consideration is that Countrywide's

funds were paid into the Las Vegas joint account, allegedly opened and maintained only by Edison,

and of which Phleger allegedly knew nothing until February 2006, by which time Edison had

drained it.  SAC ¶ 75.

Countrywide counters on two grounds.  First, Countrywide notes that under Civil Code

§ 1614, "[a] written instrument is presumptive evidence of a consideration."   It also notes that under

§ 1615, "[t]he burden of showing a want of consideration sufficient to support an instrument lies

with the party seeking to invalidate or avoid it."  The Court notes that this is a burden of evidence,

however, not proof, and once some evidence is produced, the presumption is rebutted.  *Rancho*

*Santa Fe Pharmacy, Inc. v. Seyfert*, 219 Cal.App.3d 875, 268 Cal.Rptr. 505 (1990).  Phleger has

rebutted the presumption in this matter, because she has shown that there is a genuine issue of

material fact as to whether she signed the transaction documents, which if she did not, then she

would not be obligated to repay the consideration provided by Countrywide.

Countrywide also asserts, however, that it sent the loan proceeds to Stewart.  Mot. at 20.  It

claims that this is all it was obligated to do under the transaction documents.  *Id.*  It also claims that

it is not responsible for Stewart's routing of the funds.  *Id.*  Moreover, it notes that once the funds

were wired to the Las Vegas account, Phleger received full consideration.  *Id.*  And it claims that

while it is unfortunate that Edison stole these funds, Countrywide is not responsible for Edison's

illegal conduct.  *Id.*  Countrywide thus concludes that there was no failure of consideration.  *Id.*

Phleger counters that she did not receive the funds, because they went to the Las Vegas

account without her knowledge or permission.  Opp'n at 22.  In support, she raises a number of

issues which focus on whether the consideration failed "in whole or in part, *through the fault of*"

Countrywide.  *See* Civ. Code § 1689(b)(2) (emphasis added).  Before turning to her issues, the Court

notes that the undisputed evidence shows that contrary to the allegations in her SAC, she knew about the Las Vegas account as of July 19, 2005.  This does not vitiate her claim for rescission due to failure of consideration, however, as there is a genuine issue of material fact as to whether she knew about the mortgage and LOC transactions and the subsequent flow of funds into the Las Vegas account.

### 1.      Power of Attorney

Phleger asserts that Countrywide should not have funded the transaction, as it did not have a power of attorney specific to Green Street as mandated by its own standard practices.  Opp'n at 22.  She asserts that by funding the transaction without this specific power of attorney, Countrywide reasonably should have known she might not receive the funds.  *Id.*  Countrywide does not respond to this issue in its Reply.  Nonetheless, the Court notes that while Countrywide knew of this problem in August 2005, the transaction contracts were signed or "made" on September 16 or 18, 2005.  Thus, this fact cannot serve as a basis for the failure of Countrywide's consideration.  *See Taliaferro*, 216 Cal.App.2d at 411 (A failure of consideration only turns on facts occurring *after* a contract is made.).

### 2.      Missing Initials on URLAs

Phleger notes that her URLAs are not initialed.  Opp'n at 5.  She also notes that Countrywide's funding agent, Brent McClure, testified that in 2005, when he received loan documents back, if URLAs were not signed and dated, and *initialed on each page*, then the *standard practice* would be to send it back to the title company and have the borrower initial it.  *Id.* She also notes that he testified that had Phleger's URLAs not had this information, he would have returned them to Stewart.  *Id.*  She observes that Countrywide did not return her URLAs to Stewart.  *Id.* at 22.  She claims that by funding in the face of this defect, Countrywide should have known that she might not receive the funds.  *Id.*  Countrywide does not respond to this issue in its Reply.

This fact arose after the transaction documents were signed, and thus may serve as a basis for

a failure of consideration.[18]  *See Taliaferro*, 216 Cal.App.2d at 411.  The Court notes that if Stewart had received the defective URLAs back from Countrywide, then given the size of the transaction, it might have taken another look at the transaction documents, and noticed that they were dated with the same date on which they were overnighted to Edison.  It would have then stopped escrow and avoided harming Phleger.  Thus, by funding in the face of the defective URLAs, Countrywide ignored errors in the transaction process, and should have known that Phleger might not receive its funds.  As such, Phleger has shown a genuine issue of material fact as to whether there was a failure of consideration due to Countrywide's failure to return the URLAs to Stewart.

### 3.    Stewart's Breaches and the Dates on the Closing Documents

Phleger claims that Stewart breached certain escrow and closing instructions, resulting in Stewart closing escrow when it should not have, causing her injury.  Opp'n at 6-7.  She bases this assertion, in part, on the fact that Stewart overnighted the transaction documents on September 16, 2005, and closed escrow, even though they came back from the closing, dated as signed on September 16, 2005.  *Id.* at 7.  Phleger claims that Stewart, as the escrow agent, was Countrywide's agent, and thus Stewart's errors or wrongful conduct are chargeable to Countrywide.  *Id.*[19]

Countrywide replies that Stewart was both the borrower's and the lender's agent.  Reply at 12 n.9.  The Court agrees and notes that Phleger provides no legal analysis for her agency assertion which states only part of the well-known legal principle that "[a]n escrow holder is an agent and fiduciary of the *parties to the escrow*."  *See Summit Fin. Holdings, Ltd. v. Cont'l Lawyers Title Co.*,

---

[18]    The only testimony before the Court is that the requirement that they be sent to Stewart for correction, is triggered on a review *after* the transaction documents were signed.  In contrast, however, Phleger asserts that Countrywide should have detected the errors in the URLAs, such as her incorrect birth date, prior to approving the transaction.  Assuming Phleger could show that these errors should have been a concern to Countrywide, which she has not, because their review occurred prior to the transaction documents being signed, such errors would not qualify as the basis for a claim for a failure of consideration.

[19]    Phleger also claims that Countrywide should have noticed this problem, because it sent the closing documents to San Francisco on September 16, 2005, and thus when it reviewed them after closing, but prior to funding, it should have detected the impossible signature date.  Opp'n at 7.  Phleger provides no evidence for this assertion, except for a hypothetical posed to a Countrywide agent, which asks what he would have thought had he sent documents to San Francisco on this date, and when he received them back, they indicated that they had been signed in Nevada on the same date.  The undisputed evidence, however, is that Countrywide sent its documents to Stewart on September 15 or 16, 2005, expecting them to be signed on or before September 17, 2005.

27 Cal.4th 705, 711, 1160A, 117 Cal.Rptr.2d 541, 41 P.3d 548 (2002) (emphasis added).  Phleger

fails to explain why Countrywide would be liable to the borrower, or vice-versa, based on *Stewart*'s

breaches in this matter.  Thus, Phleger fails to show that there is a genuine issue of material fact as

to whether Stewart's breaches may form the basis for a claim against Countrywide for failure of

consideration.

### 4.      Landsafe Credit Report

Prior to preparing the transaction documents, Countrywide reviewed a Landsafe Credit

Merge Report for Phleger and an appraisal for Green Street.  Opp'n at 4.  Phleger asserts that the

report contains data which should have made Countrywide suspicious.  *Id.*  Phleger provides no

testimony on this issue, expert or otherwise, and on its face, the report is not "suspicious."

Moreover, and more critically, Countrywide reviewed the report *prior* to September 2005, and thus,

this fact cannot serve as the basis for a claim for failure of consideration.  *See Taliaferro*, 216

Cal.App.2d at 411.

### 5.      Other Alleged Document Irregularities

Phleger alleges a Countrywide agent should have signed four specific transaction documents,

after closing, but prior to funding.  Opp'n at 5.  Countrywide does not address this allegation in its

Reply, but the evidence to which Phleger cites completely fails to support her assertion.

Countrywide's agent testified that in regards to two of these documents the missing signatures were

irrelevant, and with regards to another document that it was not standard practice to review it as part

of the funding process.  With regards to the remaining document, Phleger has presented no evidence

that it requires a signature or whether it is reviewed as part of the funding process.  Thus, these

alleged document irregularities cannot serve as the basis for a claim for failure of consideration.

### 6.      First National Contract

Phleger asserts that Countrywide breached a contract with First National which required the

former to monitor Hannah.  Opp'n at 5.  Phleger claims that Hannah testified in his deposition that

Countrywide failed to monitor him.  *See id.*  While Countrywide fails to address this issue in its

Reply, the Court notes that Phleger does not provide any contract or any such testimony to the

Court.  Further, it is unclear on this record how this contract created a duty running to Phleger.

1   Moreover, Hannah's conduct occurred *prior* to closing, which means it could not serve as the basis

2   for a failure of consideration claim.  *See Taliaferro*, 216 Cal.App.2d at 411.

3          **7.**    **Summary**

4        The Court DENIES Countrywide's Motion for Partial Summary Judgment on Phleger's

5   claim of rescission based on a failure of consideration, to the extent predicated on the initials

6   missing from the URLAs.  The Court, however, GRANTS Countrywide's Motion for Partial

7   Summary Judgment on this claim, to the extent predicated on: the absence of a power of attorney

8   specific to Green Street; Stewart's breaches of its duty to the escrow parties or to follow the escrow

9   or closing instructions; Countrywide's review of the Landsafe Credit Merge Report; the

10  Countrywide signatures missing from exhibits 14 through 16 and 23 of Phleger's deposition

11  transcript; or an alleged breach of a contract between Countrywide and First National regarding

12  supervising Hannah.

13  **V.**    **The Truth In Lending Act**

14       In its Motion, Countrywide notes that Phleger previously filed a Motion for Partial Summary

15  Judgment [Docket No. 200] as to whether Countrywide had violated the TILA.  Mot. at 21.  It also

16  notes that it filed an opposition [Docket No. 220] to her motion.  *Id.*  Rather than restate the same

17  arguments from its opposition, in its Motion before the Court, Countrywide merely incorporates

18  them into its Motion.[20]  *Id.*  The Court notes that it denied partial summary judgment for Phleger

19  because there was a genuine issue of material fact as to whether the transaction documents had been

20  signed on September 16 or 18, 2005, or more or less than three business days prior to September 20,

21  2005, when the NORTCs were set to expire.  *See* Docket No. 268 at 6-7.  Under TILA, the NORTCs

22  must expire three business days after the closing.  *See id.* at 7-8.  When the Court denied partial

23  summary judgment for Phleger, she was the movant and Countrywide was the non-movant.

24  Although their roles are now reversed before the Court, this does not alter the disposition of

25   

26  [20]    The Court notes that Countrywide's Motion is 24 pages.  It's opposition to Phleger's Motion
for Partial Summary Judgment is 22 pages.  By incorporation, Countrywide has filed an excessively

27  long brief without the Court's permission.  Countrywide is directed to comply with Civil Local
Rule 7-2(b) in the future, and seek leave of Court, before exceeding its page limits.  The Court

28  likewise directs Phleger, who filed a 25-page opposition with an 11.5-point font, to comply with
Civil Local Rule 3-4(c)(2).

1    Phleger's TILA claim for Countrywide's Motion.  There is still a genuine issue of material fact as to

2    whether or not Countrywide violated the TILA.

3         In addition to standing on its opposition, however, Countrywide raises five allegedly new

4    issues.  First, it claims that it is entitled to partial summary judgment on Phleger's TILA claim,

5    because the only way that she could prevail on it would be if she signed the NORTCs on

6    September 18, 2005, but backdated them to September 16, 2005.  Mot. at 21.  Phleger correctly

7    notes that it is undisputed that Stewart dated the NORTCs.  Opp'n at 24.  In its Reply, Countrywide

8    broadens the allegation to encompass all transaction documents.  Reply at 14-15.  Not only is this

9    not a reply to Phleger's opposition, Countrywide raised this backdating allegation in its opposition

10   to Phleger's Motion for Partial Summary Judgment.  As the Court previously held in disposing of

11   this issue, Countrywide fails to identify what *undisputed* evidence points to Phleger, as opposed to

12   Edison or someone else, backdating the transaction documents.  *See* Docket No. 268 at 8 n.9

13        Second, Countrywide asserts that there is a disputed fact as to when the rescission dates were

14   entered in the NORTCs.  Mot. at 21.  Phleger notes that it is undisputed that Stewart entered these

15   dates in the blank NORTCs, after the closing.  Opp'n at 24.  Countrywide has no reply.  Phleger is

16   correct, as confirmed by the Court's findings in its prior Order disposing of this issue.  *See* Docket

17   No. 268 at 8 n.8.

18        Third, Countrywide asserts that Phleger's Motion for Partial Summary Judgment was

19   predicated on her signing the transaction documents on September 18, 2005, but she contradicts

20   herself by "arguing that Edison obtained the loans 'in Jean Phleger's name and without her

21   knowledge.' "  Mot. at 21.  Countrywide is merely reprising its election of remedies argument,

22   which the Court disposed of in part I *supra*.[21]

23        Fourth, Countrywide asserts that Phleger cannot show that Green Street was her primary

24   residence prior to September 16 or 18, 2005.  Mot. at 21.  It correctly notes that TILA only applies

25   to primary residences.  *Id.*  Countrywide asserts that in a deposition Phleger gave in a suit against

26

27   ───────────────

28   [21]      Countrywide also fails to provide a source for this quote, as it cites to Docket No. 234
     at 2:11, but this is Stewart's reply to Phleger's motion for partial summary judgment filed against
     Stewart.  *See* Mot. at 21.

ex-tenants who rented part of Green Street, Phleger testified that she made it her primary residence in September 2006. *Id.* at 21-22. Phleger counters that her daughter testified that she, her roommate, and her mother all made Green Street their primary residence in August 2005. Reply at 24 n.9. The Court notes that Phleger is correct. It also notes that contrary to Countrywide's assertion, due to inartful questioning in Phleger's deposition, in her suit against her ex-tenants, she gave many different dates as to when Green Street became her primary residence, including 1981 and July 2005.

Fifth, Countrywide asserts that under *Yamamoto v. Bank of New York*, 329 F.3d 1167 (9th Cir. 2003), an element of a TILA claim is that a plaintiff must prove that they can repay any borrowed funds, if they prevail. Mot. at 22. Phleger disputes Countrywide's interpretation of *Yamamoto*. Opp'n at 24. The Court notes that in *Yamamoto*, the borrowers testified that they could not fulfill TILA's tender requirement if they were to prevail on their TILA claim. *Yamamoto*, 329 F.3d at 1168. The district court gave them sixty days to show that they could tender repayment, or face dismissal. *Id.* When they could not make this showing, the court granted summary judgment for the lender. *Id.* The Ninth Circuit affirmed, holding that a district court has the discretion to modify the sequence of rescission events, under these circumstances. *Id.* The Court agrees with Phleger that the Ninth Circuit did not hold that proof of repayment is an element of a TILA claim. *See* Opp'n at 24. In its Reply, Countrywide, *without any reason*, urges the Court to follow *Yamamoto*. Reply at 15. The Court declines to, not only because Phleger has not testified that she cannot tender repayment, as the Yamamotos did, but also because it is undisputed that at the time Countrywide attempted to loan Phleger $3.85 million, she held real estate worth over $30 million, which appears to moot any question of repayment.[22]

In summary, none of Countrywide's five asserted bases entitles it to partial summary judgment on Phleger's TILA claim. The Court thus DENIES Countrywide's Motion for Partial

---

[22] In addition, the parties are not disputing repayment of $3.85 million, as approximately $1.5 million was used to pay off Phleger's $1.47 million Wells Fargo home equity line. Thus, the parties' dispute centers on the approximately $2.35 million stolen by Edison. In her SAC, Phleger repeatedly asserts that she will repay any amounts from which she benefitted, as the Court determines. *See, e.g.*, SAC ¶ 55.

1    Summary Judgment on Phleger's claim for violating the TILA.

2    **VI.    Declaratory Relief**

3         Countrywide seeks partial summary judgment on the ground that Phleger seeks a declaration

4    regarding what agreements exist between her and Countrywide.  Mot. at 23.  Countrywide asserts

5    that because it is undisputed that Phleger signed the transaction documents, Countrywide is entitled

6    to partial summary judgment on Phleger's claim for declaratory relief, as it is now moot.  *Id.*  The

7    Court notes that it is disputed whether Phleger signed the transaction documents.  Thus, the Court

8    DENIES Countrywide's Motion for Partial Summary Judgment on Phleger's claim for declaratory

9    relief.

10   **VII.   Injunctive Relief**

11        Countrywide asserts that because the Court will grant its Motion for Partial Summary

12   Judgment, it should dissolve the parties' Stipulated Preliminary Injunction preventing Green Street's

13   non-judicial sale.  Mot. at 23.  The Court notes that it has only granted Countrywide's Motion in

14   part, and that even if it had granted it in full, Phleger would still have four claims pending against

15   Countrywide: conspiracy to defraud, breach of fiduciary duty, elder abuse, and unjust enrichment.

16   The Court thus DENIES Countrywide's Motion for Partial Summary Judgment on Phleger's claim

17   for injunctive relief.

18                                                **CONCLUSION**

19        ACCORDINGLY, the Court GRANTS in part and DENIES in part Countrywide's Motion

20   for Summary Judgment or, in the Alternative, Partial Summary Judgment against Plaintiff [Docket

21   No. 241], as follows.

22        (1)    The Court DENIES partial summary judgment on the issue of whether Phleger made

23   an election of remedies when she previously filed a Motion for Partial Summary Judgment [Docket

24   No. 200] against Countrywide;

25        (2)    The Court GRANTS partial summary judgment on the issue of whether Edison was

26   Phleger's actual agent, but DENIES partial summary judgment on the issues of (a) whether Edison

27   was Phleger's ostensible agent; (b) whether Edison had the actual authority to obtain the mortgage

28   or the LOC from Countrywide; (c) whether Phleger is liable under the doctrine of respondeat

                                                      39

superior for Edison's conduct in obtaining the mortgage and the LOC; and (d) whether Edison had the ostensible authority to obtain the mortgage and the LOC;

(3)     The Court DENIES partial summary judgment on Phleger's cancellation claim to the extent predicated on her alleged election of remedies by previously filing a Motion for Partial Summary Judgment [Docket No. 200] against Countrywide, but GRANTS partial summary judgment on this claim to the extent predicated on fraud in the inception or execution;

(4)     The Court GRANTS partial summary judgment on Phleger's claim of rescission based on unilateral mistake of fact; and GRANTS partial summary judgment on Phleger's claim of rescission based on incapacity;

(5)     The Court DENIES partial summary judgment on Phleger's claim of rescission based on a failure of consideration, to the extent predicated on the fact that her initials are missing from the URLAs; but GRANTS partial summary judgment on this claim, to the extent predicated on: (a) her failure to sign the transaction documents; (b) the absence of a power of attorney specific to Green Street; (c) Stewart's breaches of its duty to the escrow parties or to follow the escrow or closing instructions; (d) Countrywide's review of the Landsafe Credit Merge Report; (e) Countrywide's signatures missing from exhibits 14 through 16 and 23 of Phleger's deposition transcript; and (f) an alleged breach of a contract between Countrywide and First National regarding supervising Hannah; and

(6)     The Court DENIES partial summary judgment on Phleger's claim for violating the TILA; DENIES partial summary judgment on Phleger's claim for declaratory relief; and DENIES partial summary judgment on Phleger's claim for injunctive relief.


IT IS SO ORDERED.


March 3, 2009                                    _____
                                                Saundra Brown Armstrong
                                                United States District Judge